390 A.2d 736

ATLANTIC RICHFIELD COMPANY

v.

William M. RAZUMIC, Appellant.

ATLANTIC RICHFIELD COMPANY, Appellant,

v.

William M. RAZUMIC.

Supreme Court of Pennsylvania.

Argued Sept. 26, 1977.

Decided Aug. 10, 1978.

Daniel J. Beggy, Pittsburgh, for William M. Razumic.

George I. Minch, Wright & Rundle, Pittsburgh, Richard E. LaFarge, Philadelphia, for Atlantic Richfield Co.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

In these cross-appeals, we hold that the trial court erred in: (1) directing a verdict entitling Atlantic Richfield Company (Arco) to take possession of the Arco service station Razumic operated for over twenty years; and (2) denying Razumic's motion for a new trial on his counterclaim for damages arising out of Arco's attempted termination of a franchise agreement.[1]

## I. PROCEDURAL HISTORY

In 1953, William Razumic, his partner Robert Mowry, and Arco signed a printed form "DEALER LEASE" prepared by Arco authorizing Razumic and Mowry to operate a newly constructed Arco service station in Monroeville. Razumic and Mowry invested more than $5,000 of borrowed funds in inventory, equipment, and working capital. Arco financed their first supply of gasoline and the pair opened for business.

Mowry died one year later, but Razumic continued to operate the station. Over the years, Razumic and Arco signed numerous writings, all of which resembled the first form. The parties also signed additional form writings prepared by Arco concerning such matters as purchase of fuel from Arco and check cashing privileges for Arco credit card customers. Razumic participated in many of Arco's promotional campaigns, and one year was named one of the top ten Arco retailers in the Pittsburgh area. An Arco marketing representative characterized Razumic as an "excellent dealer."

1. We hear these cross-appeals pursuant to the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. II, § 204(a), 17 P.S. § 211.204(a) (Supp.1978). Razumic is the appellant in No. 40 March Term, 1977, and appellee in No. 41 March Term, 1977. Arco is the appellee in No. 40 March Term, 1977, and appellant in No. 41 March Term, 1977.

In 1970, Arco completed construction of a new service station to replace the station Razumic had operated for seventeen years. That August, Razumic and Arco signed another "DEALER LEASE," again prepared by Arco, containing many of the same printed provisions as the previous forms. The 1970 writing also contained a typed provision for a three year term of occupancy. The parties signed a separate form authorizing Razumic to use Arco's property to the rear of the service station for parking rental vehicles which the Hertz Corporation authorized Razumic to rent to the public. The latter form contained a typed provision authorizing either party to terminate the Hertz parking lot agreement upon thirty days' notice, "with or without cause."

On June 29, 1973, Arco notified Razumic that his "DEALER LEASE" would not be renewed. Arco directed Razumic to leave the premises by August 1, 1973, the last day of the term stated in the writing. On July 31, Arco likewise notified Razumic that the Hertz parking lot lease would not be renewed and gave him one month to vacate the premises. When Razumic refused to vacate the station property, Arco discontinued his supply of gasoline and filed a Landlord and Tenant Complaint with the District Justice for Monroeville. The District Justice entered judgment for Arco, directing Razumic to deliver the station premises to Arco and awarded Arco damages for Razumic's detention of the premises beyond the expiration date set forth in the form "DEALER LEASE." Razumic appealed to the Court of Common Pleas of Allegheny County, filed a bond, and obtained a supersedeas.

Arco then filed a "Complaint in Assumpsit" in the Court of Common Pleas of Allegheny County, seeking fair rental value of the premises while Razumic remained in possession beyond the term stated in the "DEALER LEASE," and a "Complaint in Ejectment," seeking possession of both the service station and parking lot properties. Razumic answered and raised "New Matter and Counterclaim," requesting damages in excess of $10,000 for what Razumic characterized as Arco's wrongful attempt to terminate their business

relationship.[2] Razumic also requested a jury trial. The trial court overruled Arco's preliminary objections and denied Arco's motion for summary judgment.[3]

After both parties presented evidence, the trial court granted Arco's motions for a directed verdict of possession of both the service station and Hertz parking lot and for a compulsory nonsuit on Razumic's counterclaim. The trial court submitted to the jury Arco's claim for damages for Razumic's allegedly wrongful detention of both premises. The jury awarded Arco damages of $200 per month for Razumic's detention of the Hertz parking lot and returned no award for the service station property. Razumic moved to set aside the compulsory nonsuit and for judgment notwithstanding the verdict and a new trial, while Arco sought a new trial on the issue of damages for Razumic's detention of the service station. The trial court denied the motions and both parties appealed to the Superior Court, which affirmed without opinion. We granted Razumic's and Arco's petitions for allowance of appeal.[4]

2. Razumic's pleadings and evidence demonstrate that his counterclaim was for damages caused by Arco's attempted termination of the "DEALER LEASE" agreement, which Razumic throughout has argued embodies a franchise agreement. The record indicates that Razumic did not attempt to recover damages for Arco's termination of the Hertz parking lot lease.

3. Eight days before trial, Razumic sought leave to amend his "New Matter and Counterclaim" to include allegations of price-fixing in violation of the Sherman Act, 15 U.S.C.A. §§ 1 et seq., and "the laws of . . . Pennsylvania." The trial court refused to allow amendment. Razumic has not appealed from that ruling, but contends that the trial court should have allowed him to introduce evidence of price-fixing, at variance with his pleadings, showing Arco's attempted termination of the agreement was prompted by Razumic's failure to adhere to Arco's pricing policy. In view of our disposition, we need not reach this issue.

4. Razumic does not challenge the trial court's directed verdict of possession authorizing Arco to take possession of the Hertz parking lot. He remains in possession of the service station pending outcome of this appeal. So far as the record indicates, Arco is not presently supplying Razumic petroleum products. In *Atlantic Richfield Co. v. Zarb,* 532 F.2d 1363 (Em.App.1976), the Temporary Emergency Court of Appeals upheld a district court order invalidating an order of the Federal Agency Administration directing Arco to supply Razumic pending outcome of these proceedings.

## II. THE SERVICE STATION FRANCHISE

In his pleadings, at trial, and on appeal to this Court, Razumic has urged that he and Arco were parties to a franchise agreement Arco could not terminate at will. Arco, on the other hand, has contended throughout that the dealership agreement could be terminated for any reason. We agree with Razumic.

### A. *The Nature of The Agreement*

The 1970 printed form signed by Arco and Razumic, captioned a "DEALER LEASE," identifies Arco as "lessor" and Razumic "lessee," and uses those terms to define the parties' rights and obligations. The instrument sets the "term" of the "lease" at three years, requires "lessee" to pay taxes and various utilities and "maintain and keep in good order the leased premises." The printed form provides that "lessee's" right of possession shall not extend "beyond the period of LESSOR'S right thereto." The form also recites that "[t]his lease contains the entire agreement of the parties and its execution has not been induced by any representation, understanding, or agreement of any kind other than those herein expressed" and "cannot be amended except by written instrument duly executed by both parties." Nothing in the writing sets forth the parties' rights and obligations concerning renewal of the agreement. Arco contends the above provisions, coupled with the absence of an express provision governing renewal, demonstrate that the parties contemplated a landlord and tenant relationship, terminable by either party upon expiration of the term of occupancy. See *Sterle v. Galiardi Coal & Coke Co.*, 168 Pa.Super. 254, 77 A.2d 669 (1951) (covenants for continued renewal of leasehold interest will not be inferred); 51C C.J.S. Landlord and Tenant §§ 54 et seq. (1968).

To determine an agreement, a writing must be interpreted as a whole, giving effect to all its provisions. *Shehadi v. Northeastern Nat. Bk. of Pa.*, 474 Pa. 232, 378 A.2d 304 (1977); *Buchanan v. Brentwood Federal Savings & Loan Ass'n*, 457 Pa. 135, 320 A.2d 117 (1974); Restatement

(Second) of Contracts § 228(2) (Tent.Draft No. 5, 1970); 4 Williston, Contracts § 618 (3d ed. Jaeger 1961); 3 Corbin, Contracts § 549 (1960). An examination of all the provisions of the writing signed by Razumic and Arco reveals that the parties contemplated an agreement imposing obligations, and conferring rights, beyond those of a lessor-lessee agreement. The writing authorizes Razumic to operate an "Atlantic Richfield Service Station." The instrument further provides:

> "[T]he sole purpose and use of the leased premises shall be the lawful, diligent and businesslike operation of a first-class automotive service station retailing petroleum products and TBA merchandise [tires, batteries, and accessories] normally handled at competitive service station outlets. Recognizing that compliance with such authorized purpose and use is essential for the accomplishment of LESSOR'S desire to obtain a fair rental consistent with the reasonable value of the service station business potential of the leased premises, LESSEE agrees that he will use the leased premises only for the purpose and in the manner above designated."

Thus, the agreement required Razumic to live up to highest business standards while he served as an Arco "dealer."

Various provisions of the writing outline the scope of Razumic's and Arco's business venture. The writing fixes rent on the basis of total gallons of fuel sold per month, using "LESSOR'S then current FRANCHISE RENT SCHEDULE." The writing requires Razumic to submit a "certified, itemized statement showing all information necessary for the proper calculation of the rental" and authorizes Arco to audit "at all reasonable times" Razumic's books and records concerning sale of fuel. The writing prohibits "absentee operation" and "subletting" and does not allow Razumic to "make any additions, alterations, or improvement to the leased premises nor place, alter, remove, deface, or obliterate any signs, trademarks or color arrangements appearing thereon" without first obtaining Arco's consent. The writing also contemplates Razumic's retail sale of fuel

to Arco credit customers. Arco in return agreed to accept Razumic's assignment of these accounts. Arco "reserves the right to enter the premises at all reasonable times for the purpose of ascertaining LESSEE'S compliance with the agreements [therein] contained and for making necessary repairs and replacements."

Standardized "riders" accompanying the "DEALER LEASE" further spell out the nature of Razumic's and Arco's business relationship. One rider allows Arco to enter the premises "in its exclusive judgment, to establish a change in its trade name or other business identification and in the trademark of trade name designations of its products, including, but not limited to, painting of the service station improvements, equipment and facilities, or any part or portion thereof, and installation or replacement of signs and signboards." Another rider sets forth Razumic's agreement to "operate the Service Station in such a manner as to reflect favorably on ATLANTIC'S goodwill, trademarks and trade names and take no action that will tend to discredit ATLANTIC in any way," operate the service station twenty-four hours a day, seven days a week, maintain inventory sufficient to fulfill customer needs, arrange and display inventory, advertisements, and sales promotions in a "lawful, orderly and attractive manner," illuminate the station in the evening and early morning hours and other times "as required for safety and to attract the motoring public," and "maintain adequate and efficient attendants to properly serve LESSEE'S customers during all hours of operation."

█ We believe that the 1970 writing and its riders embody a franchise agreement.

"In its simplest terms, a franchise is a license from the owner of a trademark or trade name permitting another to sell a product or service under the name or mark. More broadly stated, the franchise has evolved into an elaborate agreement by which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchisor, and the franchisor undertakes to assist the franchisee through advertising, promotion and other advisory services."

*Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 508–09, 351 A.2d 207, 211 (1976).

> "[T]he cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product."

*Susser v. Carvel Corp.*, 206 F.Supp. 636, 640 (S.D.N.Y.1962), aff'd, 332 F.2d 505 (2d Cir. 1964).[5] Given the comprehensive terms of the writing obligating Razumic to operate the Arco service station in a manner Arco determined would reflect favorably upon the public image of the Arco trademark, report and share gross receipts with Arco pursuant to a "FRANCHISE RENT SCHEDULE," and allow Arco to inspect the station to assure Razumic's continued compliance with the many provisions of the form writing, it is clear that Razumic was not pursuing solely his own business interests. Rather, Razumic conducted his business and sold his products in accordance with methods prescribed by Arco, see *Piercing Pagoda, Inc. v. Hoffner*, supra, to cause the public to turn to the Arco sign, see *Susser v. Carvel Corp.*, supra.

██ Razumic's undisputed testimony concerning performance pursuant to the parties' agreement sheds light on the writing. Razumic stated that he regularly spent his own funds to participate in Arco promotions which offered gifts to the public, purchased fuel and other products from Arco, and had no choice but to operate his station twenty-four hours a day. He further testified Arco requested that his employees wear uniforms with Arco insignias, which he rented and maintained at his own expense. Arco and Ra-

---

**5.** Accord, *Weight Watchers of Quebec Ltd. v. Weight Watchers International, Inc.*, 398 F.Supp. 1047 (E.D.N.Y.1975); *H&R Block, Inc. v. Lovelace*, 208 Kan. 538, 493 P.2d 205 (1972); Collison, "Trademarks—The Cornerstone of a Franchise System," 24 Sw.L.J. 247 (1970); Hewitt, "Termination of Dealer Franchises and the Code—Mixing Classified & Coordinated Uncertainty With Conflict," 22 Bus.Law. 1075 (1967); 15 Business Organizations, Glickman, Franchising § 2.01; 62 Am.Jur.2d, Private Franchise Contracts § 1; see generally *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 386–87, 87 S.Ct. 1856, 1869–70, 18 L.Ed.2d 1249 (1967) (Stewart, J., joined by Harlan, J., concurring in part and dissenting in part).

zumic co-sponsored a party open to the public celebrating opening of the new station in 1970. All this uncontradicted evidence of performance demonstrates Arco's control over the quality of products and services Razumic offered to the public. Moreover, this evidence, perhaps the strongest indication of what the writing means, Restatement (Second) of Contracts, supra at § 228(4) (course of performance always relevant in interpreting writing); cf. Uniform Commercial Code, Act of April 6, 1953, P.L. 3, §§ 2–202(a) & 2–208, 12A P.S. §§ 2–202(a) & 2–208 (1970) (same rule applies to writings evidencing sale of goods), confirms our conclusion that the Razumic-Arco service station operation was a franchise enterprise.[6]

## B. Terminating The Franchise Relationship

The writing provides Arco the right to terminate the "lease" should Razumic abandon the premises or close them "for a period of seventy-two hours." Razumic's negligence or willful misconduct causing damages to a substantial portion of the premises gives Arco "the right to terminate this lease without liability." Razumic's failure to make timely payment of rent, his death or insolvency, or governmental taking also permit Arco to terminate the "lease." Further, Razumic's "fail[ure] to comply with any of his other obligations" set forth in the writing permits Arco to terminate the agreement if Razumic fails to remedy the situation after fifteen days' notice of non-compliance.

**6.** Though our prior cases limited a court's use of evidence of course of performance to aid interpretation to instances where the writing is ambiguous, see e. g., *Maguire v. Osborne*, 384 Pa. 430, 121 A.2d 147 (1956), we agree with the draftsmen of the Restatement (Second) of Contracts that:

> "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."

Restatement (Second) of Contracts § 228 Comment g (Tent.Draft No. 5, 1970). Thus, we follow the Restatement (Second), id., Comment a, and conclude that course of performance is always relevant in interpreting a writing. Accord, Uniform Commercial Code, Act of April 6, 1953, P.L. 3, § 2–202 Comment 1(c), 12A P.S. § 2–202 Comment 1(c) (1970).

The writing does not, however, contain any provision granting Arco the right to terminate the franchise agreement at will. In view of the provisions authorizing Arco to terminate the parties' franchise agreement for limited, business reasons and an additional provision authorizing Razumic, upon giving "at least sixty days advance written notice," to terminate the agreement without reason upon the anniversary of a term where the stated term exceeds one year, the absence of a similar term authorizing Arco to terminate the agreement without reason is striking.[7]

The lone provision of the writing which could support Arco's termination of the comprehensive franchise agreement is that setting a three year term of occupancy. This provision does not, however, confer upon Arco the right to terminate the franchise agreement at its pleasure.

When the motoring public stops at an Arco service station such as the one operated by Razumic for over twenty years, Arco hopes that the dealer will provide service that will be remembered favorably and produce continued patronage at not only that particular station but wherever motorists see the Arco sign. See generally Treece, "Trademark Licensing And Vertical Restraints In Franchising Arrangements," 116 U.Pa.L.Rev. 435, 436–39 (1968). Correspondingly, Arco here has over the years sought every assurance from Razumic that he will use his best efforts in selling, displaying, promoting, and merchandising Arco products and attracting, serving, and satisfying Arco customers.

An Arco dealer has his own expectations. He knows that his good service will in many instances produce regular customers. He also realizes, however, that much of his trade will be attracted because his station offers the products,

7. The Hertz parking lot lease, also a printed form supplied by Arco, containing a provision authorizing termination by either party at will, underscores the absence of an express clause governing Arco's right to terminate the franchise agreement at will. The form instrument contains the following typed provision:

"NOTWITHSTANDING any conditions contained herein to the contrary, it is hereby mutually agreed that either LESSOR or TENANT may cancel this lease, with or without cause, by giving to the other 30 days prior written notice."

services, and promotions of the well-established and well-displayed name "Arco." Unlike a tenant pursuing his own interests while occupying a landlord's property, a franchisee such as Razumic builds the goodwill of both his own business and Arco.

In exchange, an Arco dealer such as Razumic can justifiably expect that his time, effort, and other investments promoting the goodwill of Arco will not be destroyed as a result of Arco's arbitrary decision to terminate their franchise relationship. Consistent with these reasonable expectations, and Arco's obligation to deal with its franchisees in good faith and in a commercially reasonable manner,[7a] Arco cannot arbitrarily sever its franchise relationship with Razumic. A contrary conclusion would allow Arco to reap the benefits of its franchisees' efforts in promoting the goodwill of its name without regard for the franchisees' interests.

The weight of commentary has argued in favor of judicial recognition that the nature of a franchise agreement imposes a duty upon franchisors not to act arbitrarily in terminating the franchise agreement. E. g., Gellhorn, "Limitations on Contract Termination Rights—Franchise Cancellations," 1967 Duke L.J. 465; C. Hewitt, "Good Faith or Unconscionability—Franchisee Remedies For Termination," 29 Bus.Law. 227 (1973). The Supreme Court of Utah has concluded that where parties to a "chain-style" franchise agreement do not expressly provide for termination of a franchise agreement without cause, it is reasonable to presume that the franchisor agrees not to terminate the franchisee's tenure arbitrarily. *Seegmiller v. Western Men, Inc.*, 20 Utah 2d 352, 437 P.2d 892 (1968). The Supreme Court of New Jersey has held that the New Jersey Franchise Practices Act, N.J.S.A. 56:10–1 et seq., proscribing a franchisor's termination of franchise agreements except for just cause, embodies poli-

**7a.** Restatement (Second) of Contracts, supra at § 231 (imposing standard of good faith on contracting parties); Hewitt, "Termination of Dealer Franchises and the Code—Mixing Classified and Coordinated Uncertainty With Conflict," 22 Bus.Law. 1075, 1086 (1967); cf. Uniform Commercial Code, § 1–102(3) (imposing same standard in commercial transactions involving sale of goods).

cies in existence before the effective date of the Act, and therefore implied a covenant of renewal in an agreement predating the Act. *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973). See generally, 62 Am.Jur.2d, Private Franchise Contracts § 12 (1972); Friedman, Leases § 14.1 n.1 (1974 and Supp.1977). The Supreme Court of Appeals of West Virginia has held unenforceable a provision of a writing authorizing a petroleum supplier to terminate its dealer agreement when, in the supplier's sole judgment, the dealer has engaged in practices impairing the goodwill of the supplier. *Ashland Oil, Inc. v. Donahue*, W.Va., 223 S.E.2d 433 (1976).[8]

Our judgment is consistent with not only this current authority, but also that of the Legislature. The Act of November 26, 1975, P.L. 454, §§ 1 et seq., 73 P.S. §§ 202–1 et seq. (Supp.1978), prohibits suppliers of petroleum products from cancelling, terminating, or failing to renew agreements with dealers except in very limited, business-related situations. Id., § 3(b), 73 P.S. § 202–3(b).[9] Section 3(d), 73 P.S.

**8.** Our holding today does not sweep as far as *Shell Oil Co. v. Marinello*, 63 N.J. 402, 307 A.2d 598 (1973), or *Ashland Oil, Inc. v. Donahue*, W.Va., 223 S.E.2d 433 (1976), where the courts refused to enforce express provisions of writings authorizing petroleum suppliers to terminate franchise agreements with their dealers without good cause. Here, the writing and its riders contain no such express provisions.

**9.** Section 3(b) of the Act, 73 P.S. § 202–3(b) provides:
"It shall be a violation of this act for any lessor supplier to directly or indirectly terminate, cancel or fail to renew an agreement with the lessee dealer unless the termination, cancellation or failure to renew is for one of the following reasons:
(1) The lessee dealer has abandoned or has given notice of its intention to abandon the leased premises, in which event the requirement of 90 days' notice need not be given.
(2) The lessee dealer has filed for or has been declared bankrupt or has petitioned for a reorganization, creditor arrangement or insolvency under the applicable statutes.
(3) A dissolution of a partnership or corporation or other entity carrying on the business.
(4) The lessor supplier has lost its right to grant possession of the premises.
(5) Wilful or malicious destruction of the property of the lessor supplier by the lessee dealer or someone over whom he has control or should have exercised control.

§ 202–3(d), expressly proscribes cancellations based on enumerated considerations.[10] The Act further bars a dealer's relinquishment of the rights provided in the Act as a condition to formation of a supplier and dealer agreement, id., § 4(1), 73 P.S. § 202–4(1), and prohibits terms or conditions in such agreements contrary to the Act, id., § 4(5), 73 P.S. § 202–4(5). Even though the provisions of the Act are not expressly applicable to the agreement between Razumic and Arco, see id., § 5, 73 P.S. § 202–5 (Act effective February, 1976), the statute embodies sound and beneficial legislative judgments which reflect both the expectations and obligations inherent in this franchise relationship. See *Shell Oil Co. v. Marinello,* supra (New Jersey Franchise Practices Act

> (6) Failure to pay financial obligations to the lessor supplier when due including, but not limited to, rents or payment for gasoline, petroleum products or accessories supplied to the lessee dealer by the lessor supplier.
> (7) Adulteration, commingling, or mislabeling or misbranding of products supplied by the lessor supplier.
> (8) Failure by the lessee dealer to comply with Federal, State or local laws or regulations which are related to the operation of the gasoline service station business and which may affect the relationship between the lessor supplier and the lessee dealer and such failure to comply therewith has or may have an adverse effect on the lessor supplier.
> (9) Conviction of the lessee dealer of a criminal offense which is related to the operation of the business or would affect the ability of the lessee dealer to operate the business or would tend to defame the reputation of the lessor supplier."

10. Section 3(d) of the Act, 73 P.S. § 202–3(d) provides:
> "(d) In determining whether or not an agreement shall be terminated, cancelled or not renewed the failure or refusal of the lessee dealer to do any of the following shall not be grounds for such action:
> (1) Refusal by the lessee dealer to take part in promotional campaigns of the lessor supplier's products.
> (2) Failure by the lessee dealer to meet sales quotas suggested by the lessor supplier.
> (3) Refusal by the lessee dealer to sell gasoline or other products at a price suggested by the lessor supplier.
> (4) Refusal by the lessee dealer to keep the premises operating and open during those hours which are proven by the lessee dealer to be unprofitable.
> (5) Refusal by the lessee dealer to give the lessor supplier financial records of the operation which are not related or necessary to the lessee dealer's obligations under the agreement."

embodies policies predating Act); see generally, e. g., W. Schaefer, "Precedent and Policy," 34 U.Chi.L.Rev. 3 (1966).[11]

■ For the above reasons, the writing's leasehold terminology stating a three year term of occupancy does not govern the duration of the comprehensive contractual business relationship between Razumic and Arco. Rather, the language establishes a right of occupancy which the franchisee Razumic can reasonably expect will not be abruptly halted. Consistent with Razumic's reasonable expectations, principles of good faith and commercial reasonableness, Arco may not arbitrarily recover possession of the service station and thereby summarily terminate the franchise relationship. Accordingly, the trial court erred in directing a verdict authorizing Arco to take possession of the service station property and we therefore grant Razumic a new trial.[12]

### III. THE COUNTERCLAIM FOR DAMAGES

Razumic asserts that the trial court erred in granting Arco's motion for a compulsory nonsuit on his counterclaim for damages caused by Arco's attempted termination of their franchise agreement and should have granted his motion for a new trial on the issues of damages.[13] He contends that because Arco offered evidence before moving for the compulsory nonsuit, the trial court was without authority

11. Other jurisdictions, including Delaware, Michigan, and New Jersey, have enacted similar legislation placing limitations upon the authority of franchisors to terminate franchise relationships with franchisees arbitrarily. See P. Baird, J. Hay, & J. Bailey, "Government Regulation of Real Estate Franchising," 12 Real Prop.Prob. & Trust J. 580, 595–96 n.83 (1977) (citing statutes).

12. *Weilersbacher v. Pittsburgh Brewing Co.*, 421 Pa. 118, 218 A.2d 806 (1966), holding that a supplier or distributor of beer may terminate at will an oral agreement silent on duration and not entered into in circumstances demonstrating the parties intended otherwise, is not to the contrary. The business relationship before us is far more complex than the supplier-distributor relationship presented in *Weilersbacher* and the parties here can reasonably entertain different expectations of each other.

13. Razumic did not seek damages for Arco's termination of the Hertz parking lot lease. See supra note 2.

under the Act of March 11, 1875, P.L. 6, § 1, as amended, 12 P.S. § 645 (Supp.1978), to grant Arco's motion.[14]  We agree.

At trial, Razumic testified on his own behalf concerning his Hertz franchise.  On cross-examination, Arco sought to discredit Razumic's statement that he and Hertz had only one agreement since 1957 by showing him a subsequent writing he and Hertz signed.  Razumic also testified concerning damages.  On cross-examination, Arco used Razumic's 1970 federal income tax return to attack Razumic's testimony regarding the station's profitability.

Upon completion of Razumic's case, Arco moved for a compulsory nonsuit, and argued the motion.  Before Razumic argued against the motion, Arco offered the Hertz agreement and tax return.  Four days later, the trial court granted Arco's motion.

A motion for a compulsory nonsuit allows a defendant to test the sufficiency of a plaintiff's evidence. *Francioni v. Gibsonia Truck Corp.,* 472 Pa. 362, 372 A.2d 736 (1977); *Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417 (1976).  To assure that the trial court considers the motion only on the basis of evidence favorable to the plaintiff, the Act expressly limits the court's authority to grant a nonsuit to those instances where a defendant has "offer[ed] no evidence." Our cases have strictly enforced the terms of the Act, prohibiting the trial court from granting the motion where the defendant offers evidence either during the plaintiff's case, *Highland Tank & Mfg. Co. v. Duerr,* 423 Pa. 487, 225 A.2d 83 (1966); *Catanzaro v. Pennsylvania R. Co.,* 230 Pa. 305, 79 A. 624 (1911), or after it. *F. W. Wise Co. v. Beech Creek R. Co.,* 437 Pa. 389, 263 A.2d 313 (1970); *Jordan v. Sun Life Assurance Co. of Canada,* 366 Pa. 495, 77 A.2d 631 (1951).  We have even held that where the defendant ex-

14.  Section 1 of the Act of March 11, 1875 provides:
"Whenever the defendant, upon the trial of a cause in any court of common pleas of this commonwealth, shall offer no evidence, it shall be lawful for the judge presiding at the trial to order a judgment of nonsuit to be entered, if, in his opinion, the plaintiff shall have given no evidence as in law is sufficient to maintain the action  .  .  .."

ceeds proper bounds of cross-examination so as to elicit matters constituting a defense to the cause of action, the trial court is without authority to enter a nonsuit. *Smith v. Standard Steel Car Co.,* 262 Pa. 550, 106 A. 102 (1919); *Hughes v. Westmoreland Coal Co.,* 104 Pa. 207 (1883).

Here, though Arco did not offer the Hertz agreement and the 1970 federal tax return until after it argued for a nonsuit, the trial court still had before it Arco's evidence when it evaluated the motion. We think the express language of the Act of March 11, 1875 and our cases strictly interpreting it compel the conclusion that the court could not enter a nonsuit because Arco had offered evidence.

■ Arco alternatively contends that, even if its offer of evidence prevented the trial court from entertaining the motion, the error was harmless because Razumic failed to meet his burden of showing damages. We do not agree. At trial, Professor Walter Dolde testified for Razumic concerning the likely loss of income resulting from Arco's termination of the parties' business relationship. Dolde calculated that Razumic would likely receive a greater future income as an Arco dealer and Hertz franchisee than he would without a supply of gasoline while still marketing other automotive services and renting Hertz vehicles. We think this evidence was sufficient to prove damages resulting from Arco's arbitrary, unlawful termination of the parties' franchise agreement and therefore Razumic must be awarded a new trial on this issue.

## IV. CONCLUSION

■ In its cross-appeal, Arco asserts that the trial court erred in denying its motion for a new trial on detention damages. Arco contends that the court's directed verdict of possession in an action in ejectment conclusively established its right to detention damages, and therefore the trial court erred in allowing the jury to consider whether Arco fulfilled its "duty to mitigate." According to Arco, this resulted in the jury's award of "no damages" for Razumic's detention of the service station.

We have granted Razumic's request for a new trial on Arco's right to possession of the service station. Should Razumic, upon retrial, prevail in Arco's attempt to terminate the franchise agreement, Arco's right to detention damages will not arise. See *Crawford v. Town of Hamburg,* 19 A.D.2d 100, 241 N.Y.S.2d 357 (1963) (to recover detention damages, plaintiff must first prevail in action in ejectment); 28 C.J.S. Ejectment § 132 (same). It is therefore appropriate to vacate the order of the Superior Court affirming the trial court's order. See *Commonwealth v. Hart,* 479 Pa. 84, 87, 387 A.2d 845, 847 (1978) ("[I]n civil proceedings, . . . upon grant of a new trial, the prior judgment is set aside and the case, including all matters raised by the pleadings, is restored to the status it had before any trial took place as though no trial had been held. *Giles v. Ryan,* 317 Pa. 65, 176 A. 1 (1935)").

Accordingly, the order of the Superior Court at No. 40 March Term, 1977 is reversed, the order at No. 41 March Term, 1977 is vacated, and the case is remanded for a new trial.

PACKEL, J., did not participate in the decision of this case.

POMEROY, J., filed a Concurring Opinion in which NIX, J., joins.

POMEROY, Justice, concurring.

I agree with the conclusion of the majority that the agreement between William M. Razumic and Atlantic Richfield Company (Arco), although largely couched in language defining a lessor-lessee relationship, contained elements of a franchise relationship as well; the case cannot be treated and decided, therefore, as if we were dealing only with a lease.

Where the duration of a franchise arrangement is indefinite, the courts, recognizing the substantial commitments which a lessee-franchisee finds it necessary to undertake in operating under such a contract, properly imply an obliga-

tion on the franchisor not to act arbitrarily in terminating the relationship. Professor Williston has commented upon the termination aspects of an indefinite term contract of this type as follows:

> "The elaborate instruments used to create these distributorships, it should be remembered, are almost invariably drawn by or on behalf of the manufacturer and presented to the dealer or exclusive agent simply for his signature, not for further negotiation. The very fact that so frequently this carefully drawn instrument leaves the question of its termination, 'an obligation incompletely expressed,' and the startlingly disproportionate burden otherwise cast upon the dealer should here, as in the requirement and output contracts, justify the courts in inferring an intention to bind both parties for at least such time as may be required to demonstrate the cause or to establish grounds for honest dissatisfaction, or otherwise for a reasonable time just as where no other provision is made. And further, these contracts are made, if not upon an express promise, at least upon the understanding and expectation that the dealer will make a substantial investment in establishing or maintaining a business equipment or a service such as will successfully promote the sale of the manufacturer's products within the exclusive territory." IX Williston on Contracts (3rd ed.) § 1017a, pp. 162–165 (footnotes omitted).

Because, however, (with the exceptions hereafter noted) such considerations do not apply with equal weight to a contract like the one before us which contains a specific term, I am constrained to file this separate opinion.

The parties in the case before us entered into an agreement which was to continue for a three-year period. No provision was made as to renewal of the contract. The majority, relying on authority which deals with franchise agreements having no fixed term,[1] in effect excises the

1. *See, e. g.,* Gellhorn, *Limitations on Contract Termination Rights—Franchise Cancellations,* 1967 Duke L.J. 465; C. Hewitt, *Good Faith or Unconscionability—Franchisee Remedies for Termination,* 29 Bus.

three-year term provision from the contract and reads into the contract a duty on the franchisor-lessor to keep the agreement in force indefinitely, with no provision of any sort for termination, so long as the franchisee fulfills its obligation to provide good service to the public, and otherwise performs as required by the agreement. I cannot agree.

Of course, where an agreement of this nature provides for an express term, that term must be reasonable; a franchisor should not be able, by use of multiple renewals of short term agreements, to provide opportunities for the arbitrary termination of a franchise to the detriment of the franchisee. See IX Williston on Contracts, *supra; Annotation: Distributorship Contracts—Termination,* 19 A.L.R.3d 196, § 18[a] (What constitutes a reasonable time for the duration of a distributorship?); Gellhorn, *Limitations of Contract Termination Rights—Franchise Cancellations,* 1967 Duke L.J. 465. Likewise, although the duration of a fixed term may be of reasonable length, a franchisor, because of his prior course of dealing, may be estopped from refusing to renew without cause. Professor Gellhorn has expressed it this way:

"Although the ground rules of estoppel are similar to those of waiver, its application does not necessarily involve the same problems. When the terminated dealer alleges that the manufacturer is estopped from terminating the contract on the ground asserted, the question of proof revolves around whether the terminated dealer can show (1) that he changed his position in reliance on the manufacturer's conduct and (2) that such reliance was reasonable. The difficulty of proving that the manufac-

Law. 227 (1973); *Seegmiller v. Western Men, Inc.,* 20 Utah 2d 352, 437 P.2d 892 (1968). Furthermore, it should be observed that regardless of the wisdom of the Act of November 26, 1975, P.L. 454, §§ 1 *et seq.,* 73 P.S. §§ 202–1 *et seq.* (Supp.1978) which as noted by the majority now governs the cancellation and renewal of such franchise agreements, the Act has no applicability whatsoever to the instant case which arose prior to the Act's effective date. Indeed, if any conclusion were to be drawn from the passage of this legislation it would be that the General Assembly was seeking to alter a previously legitimate practice.

turer has taken an "inconsistent" position, often an insurmountable roadblock for the dealer asserting a waiver defense, may be overcome by evidence that the manufacturer knew of the dealer's change of position and failed to object." Gellhorn, *supra,* 1967 Duke L.J. at 488–89 (footnotes omitted).

Assuming that neither estoppel nor a succession of unreasonably brief terms is present in a given situation, I strongly doubt the wisdom of this Court's presuming to insist that the business relationship of the parties be continued indefinitely at the will of the franchisee. Courts generally have not gone so far. As one commentator has noted:

"It is obvious why the *courts have been particularly reluctant to grant relief in non-renewal cases,* especially where the continuance of a complicated interdependent business relationship is sought. Virtually all of the very limited number of cases won by franchisees have involved alleged wrongful exercise of franchise cancellation provisions *rather than alleged claims of wrongful non-renewal of a fixed term franchise.* The idea that the courts can or should review the duration provisions of franchises presents a direct challenge to the right of merchants to agree in advance on a foundation feature of their business risks and relationships." C. Hewitt, *Good Faith or Unconscionability—Franchisee Remedies for Termination,* 29 Bus.Law. 227, 233–234 (1973) (footnotes omitted) (emphasis added).

In the case at bar, the trial court refused to permit the franchisee, Razumic, to introduce evidence of his performance or of trade usage between Arco and its dealers tending to show that the dealership "leases" were customarily renewed so long as the service station was operated in a business-like manner. The purpose of the offers, presumably, was to establish that Arco should be estopped from arbitrarily refusing to renew the agreement. The record is equally uninformative as to whether the term of three years was a reasonable period within which the franchisee could obtain a fair return on his investment and his efforts on

behalf of Arco with respect to the newly constructed station. In my view of the case, evidence of these matters was important in determining the validity and enforceability of the three year term. It is for this reason that I would grant a new trial, and thus I concur in the order of the Court.

NIX, J., joins in this Opinion.