485 A.2d 836

MATT LAMB & SONS, INC.

v.

CHRISTIAN SCHMIDT BREWING COMPANY, William H.
Pflaumer & Sons, Inc., William H. Pflaumer,
Robert Pflaumer.

Appeal of CHRISTIAN SCHMIDT BREWING COMPANY
and William Pflaumer (at No. 3081).

Appeal of WILLIAM H. PFLAUMER & SONS, INC. and
Robert Pflaumer (at No. 3082).

Superior Court of Pennsylvania.

Argued June 27, 1984.

Filed Dec. 14, 1984.

Richard S. Watt, Norristown, for appellants (at No. 3081) and appellees (at No. 3082).

John S. Halsted, West Chester, for appellant (at No. 3082) and for appellees (at No. 3081).

Norman P. Zarwin, Philadelphia, for Matt Lamb, appellee.

Before OLSZEWSKI, POPOVICH and CERCONE, JJ.

CERCONE, Judge:

The Pennsylvania Liquor Code, 47 P.S. § 4–431(d)(4) (Supp.1984–85) vests jurisdiction and the power to enjoin in the court of common pleas any termination of a franchise or agreement between a malt and brewed beverages manufacturer and its distributor, subject to certain exceptions. Appellee Matt Lamb and Sons, Inc. (Lamb) sought an injunction against appellant Christian Schmidt Brewing Company, *et al.* (Schmidt) to prevent Schmidt's attempted termination of certain distribution rights of Lamb. The chancellor in equity, Hon. Leonard Sugerman, granted a preliminary injunction and, after a hearing, continued the injunction until final hearing. Schmidt appealed the continuation of

the injunction pursuant to Pa.R.A.P. 311(a)(4), Interlocutory Appeals as of Right.[1]

Schmidt raises three issues on appeal. (1) Whether the court of common pleas has jurisdiction under the section of the Liquor Code, supra, to enjoin termination of an agreement between a manufacturer and a distributor; (2) whether Lamb clearly established that its status was not terminated for good cause; (3) whether Lamb established that an award of damages would be inadequate to compensate Lamb sufficient to show that an injunction should issue.

The facts underlying this cause of action are contained in the chancellor's opinion and are as follows:

"At all relevant dates, Schmidt, a Pennsylvania corporation with its principal office in Philadelphia, Pennsylvania was and remains a manufacturer of malt and brewed beverages, licensed as such by the Pennsylvania Liquor Control Board ('PLCB'), pursuant to the Liquor Code, 47 P.S. §§ 1–101, *et seq.* ('The Code'). At the same dates, Lamb, a Pennsylvania corporation, as well, with its principal office in Chester County, Pennsylvania, was and remains a distributor of malt and brewed beverages, licensed as such by the PLCB pursuant to The Code.

"By letter agreement dated December 30, 1963, executed on January 3, 1964, Schmidt constituted Lamb a 'primary' or 'original' supplier of certain of Schmidt's products in a designated territory encompassing sections of Chester, Lancaster and Berks Counties. [It is undisputed that Lamb has been a distributor of Schmidt's products, under various letter agreements, since at least 1934.] Such agreement was made pursuant to The Code, § 4–431, permitting a Pennsylvania manufacturer to constitute a licensed distributor as the primary or original supplier of its products within a designated geographical area.

"A distributor who has been constituted a primary or original supplier by a manufacturer enjoys a competitive

---

1. A brief, *amicus curiae,* was submitted by the Malt Beverage Distributors Association of Pennsylvania, Inc.

advantage within its designated geographical area, as the manufacturer's products may only be sold through the primary supplier, and other distributors who wish to sell the manufacturer's products within the primary supplier's designated territory are required to purchase such products from or through the primary supplier.

"In any event, subsequent to the execution of the letter agreement of December 30, 1963, Lamb continued to distribute Schmidt's products within its designated territory [In 1981, Lamb purchased additional territory in Chester County from another of Schmidt's primary suppliers.] as a primary supplier without incident until The Code was amended in 1980. The amendment enacted June 22, 1980, to become effective on August 22, 1980, *inter alia*, added subsections (d)(1), –(4), and –(5), to Section 4–431 of The Code, and provided:

'(d)(1) All distributing rights as hereinabove required shall be in writing, shall be equitable in their provisions and shall be substantially similar to terms and conditions with all other distributing rights agreements between the manufacturer and giving such agreement and its other importing distributors and distributors shall not be modified, canceled, terminated or rescinded by the manufacturer without good cause, and shall contain a provision in substance or effect as follows: "The manufacturer recognizes that the importing distributor and distributor are free to manage their business in the manner the importing distributor and distributor deem best and that this prerogative vests in the importing distributor and distributor the exclusive right to establish a selling price, to select the brands of malt or brewed beverages they wish to handle and to determine the efforts and resources which the importing distributor and distributor will exert to develop and promote the same of the manufacturer's products handled by the importing distributor and distributor. However, the manufacturer expects that the importing distributor and distributor will price competitively the products handled by them, devote reasonable effort

and resources to the sale of such products and maintain a reasonable sales level." "Good Cause" shall mean the failure by any party to an agreement, without reasonable excuse or justification, to comply substantially with an essential, reasonable and commercially acceptable requirement imposed by the other party under the terms of an agreement.

. . . . .

(4) The court of common pleas of the county wherein the licensed premises of the importing distributor or distributor are located is hereby vested with jurisdiction and power to enjoin the modification, rescission, cancellation or termination of a franchise or agreement between a manufacturer and an importing distributor or distributor at the instance of such importing distributor or distributor who is or might be adversely affected by such modification, rescission, cancellation or termination, and in granting an injunction the court shall provide that no manufacturer shall supply the customers or territory of the importing distributor or distributor by servicing the territory or customers through other importing distributors or distributors or any other means while the injunction is in effect: Provided, however, That any injunction issued under this subsection shall require the posting of sufficient bond against damages arising from an injunction improvidently granted and a showing that the danger of irrevocable loss or damage is immediate and that during the pendency of such injunction the importing distributor or distributor shall continue to service the accounts of the manufacturer in good faith.

(5) The provisions of this subsection shall not apply to Pennsylvania manufacturers whose principle place of business is located in Pennsylvania unless they name or constitute a distributor or importing distributor as a primary or original supplier of their products subsequent to the effective date of this act, or unless such Pennsylvania manufacturers have named or constituted a distributor or importing distributor as a primary or original supplier of their products prior to the effective date of

this act, and which status is continuing when this act becomes effective.'

"Apparently in anticipation of the effective date of the amendment to The Code, Schmidt, on August 11, 1980, forwarded a proposed new letter agreement to Lamb purporting to cancel the letter agreement of December 30, 1963, and designating Lamb as a 'secondary importing distributor' of Schmidt's products, and designating *itself* as primary or original supplier of Schmidt's products. Lamb's president executed the letter agreement on August 27, 1980, in the belief that the revised agreement would work no substantive alteration of the Lamb-Schmidt relationship.[2]

**2.** The letter agreement also contained the following conditions:
"Your firm shall:
 1. provide and maintain effective management of its business at all times, including back up personnel qualified to operate it when and for as long as necessary, and
 2. use its best efforts to obtain maximum distribution and sales of Schmidt brand(s) in its territory by being competitive and aggressive, and
 3. regularly call on, and cultivate all trade outlets in its area, and
 4. maintain an adequate inventory, both packaged and draft of Schmidt brand(s) purchased at regular intervals, and
 5. engage in proper stock rotation procedures of which it is advised in order to keep the product fresh at all times in its warehouse and in retail outlets in accord with overage product standards published from time to time by Schmidt, and
 6. maintain adequate facilities and equipment to service its brand(s) including sufficient space within its warehouse for the proper handling, storage and safekeeping of Schmidt's returnable bottles, cases, pallets, slipboards and cooperage, and
 7. make maximum use of product identification and awareness to the extent permissible by regulatory authorities—signs, trucks, uniforms, use and placement of point of sale, and merchandising materials, and
 8. retain a designated Brand manager at your sole cost and expense where deemed necessary by Schmidt, and in addition thereto, in any event, retain a sufficient number of sales personnel whose services will be utilized to provide the proper support for the Schmidt brand(s) in the manner contemplated hereby, and
 9. respect, honor, and cooperate with Schmidt policies, and
 10. participate in permissible Schmidt sales promotion programs and activities, and
 11. maintain adequate sales records by customer and by brand and afford to Schmidt the right, at its sole expense, to designate a

"Apparently, Lamb's belief was well founded as the relationship remained the same for some time thereafter. Following execution of the letter agreement dated August 11, 1980, and notwithstanding the same, Lamb continued to purchase Schmidt's products directly from Schmidt and to the knowledge of Lamb's president, Schmidt did not sell directly to any other purchasers in Lamb's territory.

"On March 17, 1982, Lamb's president met with one Robert Pflaumer, chief executive officer of William H. Pflaumer & Sons, Inc. and others. Robert Pflaumer is the son of William H. Pflaumer, who in turn is chairman of the board of Schmidt. William H. Pflaumer & Sons, Inc.'s sole stockholder is Janet Pflaumer, mother of Robert and William's wife. During the course of the meeting, Lamb's president was advised by William H. Pflaumer & Sons, Inc.'s marketing director that the latter company had been granted the distribution rights in the five-county Philadelphia area for a new product about to be marketed by Schmidt known as 'Schmidt's Golden Classic' beer, and that Lamb could obtain the right to distribute Golden Classic in Chester County if Lamb agreed to purchase all other Schmidt's products from William H. Pflaumer & Sons, Inc., rather than purchasing such products directly from Schmidt, as theretofore. A few days thereafter, Lamb rejected Pflaumer's proposal, and told the company that although Lamb would be willing to further discuss the proposed purchase of Golden Classic from Pflaumer, Lamb was satisfied with its relationship with Schmidt and wished to continue to purchase other Schmidt's products directly from Schmidt as before.

"Approximately four weeks thereafter, on April 12, 1982, Schmidt forwarded a letter to Lamb citing alleged deficiencies in the operation of Lamb's distributorship, all asserted violations of the conditions set forth in the letter agreement of August 11, 1980. In the letter of April 12, 1982, Schmidt threatened to terminate the letter agreement of August 11,

representative to examine such sales during normal business hours."

1980, within 90 days unless the alleged deficiencies were corrected by Lamb. Lamb responded to Schmidt on April 28, 1982, advising Schmidt that those deficiencies which did exist had been corrected. A further exchange of letters occurred concerning the alleged deficiencies, and on July 12, 1982, Schmidt advised Lamb's counsel, by letter, that as the alleged deficiencies had not been corrected to Schmidt's satisfaction, the letter agreement of August 11, 1980, constituting Lamb a secondary importing distributor was canceled as of July 16, 1982."

 Initially we note that our scope of review of preliminary injunctions is limited to whether there were any apparently reasonable grounds for the action of the court below. Only if no grounds exist to support the decree of a court of equity, so that a court's ruling was palpably erroneous or a misapplication of the law, will an appellate court disturb the decision. *Wolf v. Baltimore*, 250 Pa.Superior Ct. 230, 378 A.2d 911 (1977).

We turn our attention to appellants' first contention that Schmidt is not to be subject to the control of the common pleas court because it is a Pennsylvania manufacturer under subsection 4–431(d)(5). The significance of that section is that the "good cause" requirement of subsection 4–431(d)(4), which is enjoinable if not followed, does not apply to Pennsylvania manufacturers

(a) "unless they name or constitute a distributor or importing distributor as a primary or original supplier of their products subsequent to the effective date of this act," or

(b) "unless such Pennsylvania manufacturers have named or constituted a distributor or importing distributor as a primary or original supplier of their products prior to the effective date of this act, and which status is continuing when this act becomes effective."

Appellants contend that they admittedly sought to avoid the strictures of the amendment to the Liquor Code which set forth the "good cause" requirement by sending the August 11, 1980, letter nine days before the effective date

of the amendment. That letter purported to change Lamb to a "secondary" distributor; thus, claim appellants, they could terminate Lamb as a distributor on an "at-will" basis.

Not so, held the chancellor. He found that, regardless of what the letter attempted to do, the subsequent relationship of the parties spoke louder than the words. The parties agree that the relationship was basically the same. Under the principle that parties to a written contract may modify, alter, repudiate, rescind or abandon it by subsequent words or conduct, *Consolidated Tile and Slate Co. v. Fox*, 410 Pa. 336, 189 A.2d 228 (1963), the chancellor found that the letter agreement of August 11, 1980, really had no effect on the status of Lamb as a primary distributor.

Appellants take issue with this and claim that, while the day to day business dealings of the parties did not change, that their legal relationship was different. Indeed, they argue, they should not be penalized for choosing to preserve the flexibility they possessed before the adoption of the amendment to cancel their relationship with distributors for any reason and at any time rather than to submit to the "good cause" requirement. We would accept this argument and grant them the literal meaning of their August 11, 1980, letter, if the letter did accomplish what it claimed. However, even Schmidt agrees that the relationship between the parties was substantially the same prior to and after the letter, which Lamb signed in acceptance. Lamb, in fact, testified that he accepted the purported new arrangement only because of assurances that it would not change things.

■■■ In *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978), the court held that the performance of the parties under an agreement is always a relevant indication of what a writing means. There the question was whether an agreement was a lease or a franchise, which determination controlled Arco's method of termination. In concluding that it was a franchisee, the court considered the uncontradicted testimony of the franchise as to performance under the agreement.

All this uncontradicted evidence of performance demonstrates Arco's control over the quality of products and services Razumic offered to the public. Moreover, this evidence, perhaps the strongest indication of what the writing means, Restatement (Second) of Contracts, supra at § 228(4) (course of performance always relevant in interpreting writing); cf. Uniform Commercial Code, Act of April 6, 1953, P.L. 3, § 2–202(a) & 2–208, 12A P.S. §§ 2–202(a) & 2–208 (1970) (same rule applies to writing evidencing sale of goods), confirms our conclusion that the Razumic-Arco service station operation was a franchise enterprise.

*Id.*, 480 Pa. at 376, 390 A.2d at 741. (footnote omitted). So also is this true in the instant case. Thus, because Lamb continued to purchase products directly from Schmidt and with virtually no change in the parties' relationship, despite the letter designating Lamb a "secondary importing distributor" we hold that Lamb continued to be "named and constituted" a primary distributor, by Schmidt thus triggering the "good cause" requirement for their termination by Schmidt as such. This in turn brings the instant controversy within the jurisdiction of the court of common pleas, pursuant to 47 P.S. § 4–431(d)(4).

■ The next issue to be addressed is whether Schmidt has shown the required "good cause" in terminating its agreement with Lamb on July 16, 1982. As quoted above, "good cause" in § 4–431(d)(1) of the Liquor Code is defined as

the failure by any party to an agreement, without reasonable excuse or justification, to comply substantially with an essential, reasonable and commercially acceptable requirement imposed by the other party under the terms of an agreement.

We agree with the chancellor that the termination of the agreement by Schmidt was not for good cause.[3]

3. § 4–431(d)(4) sets forth the standards for the issuance of injunctive relief in the context of the termination of a distribution agreement under the Liquor Code. The court of common pleas is vested with the

On April 12, 1982, the vice president for sales of Schmidt's sent a letter to Lamb which listed five deficiencies to substantiate the termination. They were described as violations of the Secondary Importing Distributor Agreement of August 11, 1980.

(1) Failure to use your best efforts to obtain maximum distribution and sales of Schmidt brands in your assigned territory. (Regular sales meetings are not conducted, there is no market plan, there are no goals or objectives set.)

(2) Failure to make maximum use of product identification and awareness to the extent possible or permissible by regulatory authorities. (Drivers not in uniform, poor use of point-of-sale, e.g., illuminated light draught signs.)

(3) Your failure to call on and cultivate all trade outlets in your area.

(4) Failure to participate in permissible Schmidt sales promotion activities and programs.

(5) Failure to maintain adequate sales records. (Account and package distribution records not up to date.)

The chancellor found, based on the testimony of both William C. Lamb, Jr., president of Lamb, and Robert Pflaumer, son of William H. Pflaumer, the chairman of the board of Schmidt's, that these allegations were largely unsubstantiated; they were either corrected by Lamb upon being apprised of them,[4] unexplained by Schmidt's, which fact

jurisdiction to enjoin the termination where the distributor "is or might be adversely affected by such ... termination, ... upon a showing that the danger of irrevocable loss or damage is immediate."

**4.** Lamb notified Schmidt two weeks after the letter listing the deficiencies that all uniformed personnel now bore Schmidt identification. As to Lamb's failure to use "point-of-sale" material, Lamb was made aware of only one item, Schmidt's clocks, and after being informed, he took steps to move them out.

prevented their improvement,[5] or nonexistent.[6] Thus, because the five asserted deficiencies were adequately refuted by the record, we agree with the chancellor that "good cause" was wanting in this case.

■ Finally, Schmidt challenges Lamb's resort to equity and asserts that money damages pursuant to an assumpsit action would just have adequately compensated Lamb. The chancellor found that Lamb would lose 35% of its most profitable business, 21% of gross sales, and $75,000 to $100,000 in gross profit if its role as primary distributor of Schmidt's products were terminated and if it were forced to purchase as a secondary distributor. Moreover, Lamb testified that it would be required to lay off one-third of its personnel, remove one or two trucks from its fleet of seven trucks, and incur the expense of unused overhead. The findings of the chancellor are supported by the record. This constitutes immediate and irrevocable loss or damage, as required by § 4–431(d)(4) of the Liquor Code.

■ As for Schmidt's contention that injunctive relief was unnecessary and that a suit in assumpsit was Lamb's proper remedy, we need only refer once again to the guidance afforded us by the legislature in the Liquor Code itself. The clear and unambiguous wording of the Code may not be ignored and it may not be given an unreasonable interpretation. *In re Restaurant Liquor License of DeAngelis*, 183 Pa.Superior Ct. 388, 133 A.2d 266 (1957); Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1921(b). There, injunctive relief is specifically sanctioned as the means through which a wronged distributor may obtain redress. And, looking to the nature of the injury claimed,

5. Schmidt never advised Lamb concerning the unacceptability of a detailed marketing plan and market analysis which Lamb had submitted.

6. The third assertion was completely refuted by the record in that three salespersons are employed by Lamb to attempt to increase sales. The fourth assertion, regarding Lamb's lack of participation in promotions was also refuted by the record, including a story in Schmidt's own newspaper which described William Lamb in glowing terms. The fifth assertion was unsubstantiated.

354

that of damages occasioned by the destruction of an ongoing relationship, this court is at a loss as to how damages could be apportioned in an assumpsit action. Moreover, appellant has not persuaded us that equity is an inappropriate forum.

Therefore, order affirmed.

POPOVICH, J., concurred in the result.