■ JORDAN NEISSEL, Respondent, v RENSSELAER POLYTECHNIC INSTITUTE et al., Appellants, et al., Defendant. [863 NYS2d 128]—

Carpinello, J. Appeals (1) from an order of the Supreme Court (Egan, Jr., J.), entered November 30, 2006 in Columbia County, which, among other things, partially denied the motions of defendants Rensselaer Polytechnic Institute and High Voltage Electric Service, Inc. for summary judgment dismissing the complaint and cross claims against them, (2) from an order of said court, entered July 20, 2007 in Columbia County, which partially denied the motions of said defendants to, among other things, set aside the verdict rendered in favor of plaintiff, and (3) from a judgment and amended judgment of said court, entered September 25, 2007 and November 26, 2007 in Columbia County, upon a verdict rendered in favor of plaintiff.

On the morning of May 27, 2004, a circuit breaker tripped at an above-ground substation on the campus of defendant Rensselaer Polytechnic Institute (hereinafter RPI) and power to the Materials Research Center (hereinafter MRC) went out. Kevin Surman, RPI's electric shop supervisor, and two of his electricians, Timothy Hilt and Bruce Galbraith, investigated. No apparent cause for the outage was discovered, the circuit breaker was closed and power was restored. The breaker tripped again approximately 45 minutes later.

In the meantime, Surman had contacted defendant High Voltage Electric Service, Inc., with whom RPI had an agreement to provide repair services for its high voltage equipment. RPI staff advised High Voltage engineer Gus Mininberg that there appeared to be a fault in the "C phase" of the preferred voltage feed somewhere between a main substation and the switchgear in the basement of the MRC. Mininberg returned to his shop to retrieve a testing device known as a "thumper" to assist in determining the location of the fault and also contacted Martin Scher of defendant M. Scher & Son, Inc. and requested that he send two people to help locate the fault and possibly perform a cable splice. Scher sent plaintiff, a journeyman high voltage electrician, and plaintiff's father, Russell Neissel, an experienced high voltage electrician.

Once the thumper was set up, RPI electricians were stationed at various points between the substation and the switchgear to listen for the snapping sound made by the thumper. Upon arrival, plaintiff was sent to the darkened basement of the MRC

to assist. At that time, the outer metal door to the preferred switchgear, which has a key lock, was open.[1] While there, Mininberg asked plaintiff to reconnect the termination points in the preferred feed, which was necessary in order to continue to test for the fault in that feed. Plaintiff asked Mininberg if it was safe to enter the metal cabinet where the work was to be performed. Mininberg assured plaintiff that it was safe to proceed and actually placed his hands on the cables inside the cabinet to prove so. Plaintiff reconnected the cables and then left the basement, at which point, according to plaintiff, the outer door to the preferred switchgear, referred to as the "right cabinet," was open.

In the interim, and unbeknownst to plaintiff, RPI officials had decided that power needed to be restored to the freezers, refrigerators and incubators contained within the MRC in order to preserve the integrity of various projects and experiments, and thus the MRC was reenergized via an alternate feed. To this end, Mininberg and Surman disabled the automatic transfer switch in the middle cabinet so that power could be supplied to the building only via the alternate feed and thereafter closed and locked the preferred switchgear. Hilt and Galbraith reenergized the building, the lights came back on and various alarms sounded.

Meanwhile, the electricians on site then reconvened at a manhole located between the substation and the switchgear at which time another thump test was performed indicating that the fault in the C phase existed somewhere between the manhole and the junction box adjacent to the switchgear. Mininberg then sent plaintiff and his father to the basement to identify and cut the C phase cable in the junction box. According to Mininberg, he intended for one of them to wiggle the C phase cable in the junction box while the other peered through the window of the locked outer door of the switchgear to observe any corresponding movement. Simultaneously, Surman sent Hilt and Galbraith to the basement to perform the same task. Hilt and Galbraith arrived first and Hilt used his key to open the outer door to the right cabinet.

When plaintiff and his father thereafter arrived in the base-

---

**1.** The status of the inner door was the source of some dispute. Mininberg testified that both the outer and the inner door of this switchgear were open when plaintiff arrived in the basement the first time. Plaintiff's testimony on this point was conflicting, stating that it was his recollection that the inner door was bolted shut when he first saw it and, after ascertaining that it was safe to enter, he was the one who opened the inner grate but he acknowledged, in light of testimony to the contrary, that it was possible that the inner door already was open when he arrived.

ment, plaintiff observed that the lights were on and that transformers were humming, indicating some sort of power source had been activated. However, finding the outer door to the preferred switchgear open, plaintiff assumed that the switchgear was still deenergized and proceeded to attempt to identify the C phase cable.[2] As plaintiff attempted to tug on the cable in the switchgear, he came into contact with the open blades and was shocked and severely burned.

As now relevant, plaintiff commenced this action against RPI and High Voltage alleging negligence, violations of Labor Law §§ 200 and 241 (6) and the maintenance of an inherently dangerous condition. Following joinder of issue, discovery and only partially successful motions for summary judgment by RPI and High Voltage, a jury trial ensued. The jury returned a verdict finding plaintiff, RPI and High Voltage negligent and apportioning liability at 60% to RPI, 20% to High Voltage and 20% to plaintiff. It awarded $600,000 for past pain and suffering, $900,000 for future medical expenses and $3 million for future pain and suffering. RPI and High Voltage each unsuccessfully moved for judgment notwithstanding the verdict and to set aside the verdict as against the weight of the evidence and RPI unsuccessfully moved for judgment against High Voltage on its contractual indemnification claim. Supreme Court did, however, order a new trial on the issue of future medical expenses unless plaintiff stipulated to the reduced sum of $51,000, which he apparently did. RPI and High Voltage (hereinafter collectively referred to as defendants) appeal from the order partially denying their motions for summary judgment,[3] the order partially denying their posttrial motions, and the judgment and amended judgment entered on the verdict.

RPI claims that Supreme Court impermissibly curtailed its questioning of plaintiff and his father at trial, thereby severely prejudicing its defense. We are unpersuaded. Trial courts are vested with considerable discretion in supervising the extent of cross-examination (*see Cassell Vacation Homes v Commercial Union Ins. Cos.*, 157 AD2d 700, 701 [1990]) and, based upon

---

2. Although plaintiff initially believed that the inner grate to the switchgear also was open when he arrived in the basement the second time, he acknowledged, in light of the testimony offered by other witnesses, that he may have unbolted the inner grate.

3. "[A]s the right to appeal from a nonfinal order terminates upon the entry of a final judgment" (*State of New York v Joseph*, 29 AD3d 1233, 1234 n [2006], *lv denied* 7 NY3d 711 [2006]; *see Morin v Morin*, 38 AD3d 953, 954 n 2 [2007]), we must dismiss defendants' appeal from the order denying their motions for summary judgment. Their appeals from the judgment and amended judgment, however, bring this order up for review (*see* CPLR 5501 [a] [1]).

our review of the record, we perceive no abuse of that discretion here. Without detailing each of the sustained objections cited by RPI, suffice it to say that we are satisfied that RPI was able to effectively cross-examine plaintiff and his father thereby challenging their credibility and advancing its own defense.

Nor do we find merit to RPI's argument that Supreme Court erred in denying its requests to charge. RPI's requests misstated the law inasmuch as they mandated a verdict in favor of RPI in the event that the jury determined that plaintiff failed to either heed certain warnings, utilize a particular safety device or follow certain protocols. Plainly, the jury could and, as will be discussed, did determine that notwithstanding plaintiff's own culpable conduct, RPI's negligence remained a proximate cause of his injuries.

As to the jury's verdict, we reject defendants' contentions that Supreme Court erred in failing to set aside the verdict because it was either legally insufficient or against the weight of the evidence. "[B]efore a court may set aside a verdict unsupported by legally sufficient evidence and grant judgment as a matter of law, it must determine that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [people] to the conclusion reached by the jury on the basis of the evidence presented at trial" (*Lawrence v Capital Care Med. Group, LLC*, 14 AD3d 833, 834 [2005] [internal quotation marks and citation omitted]). "Where legally sufficient evidence exists, the verdict may still be set aside as against the weight of the evidence if it is determined that the evidence so preponderated in favor of the losing party that it could not have been reached on any fair interpretation of it" (*Arthur Glick Leasing, Inc. v William J. Petzold, Inc.*, 51 AD3d 1114, 1115-1116 [2008] [internal quotation marks and citation omitted]; *see Martin v Clark*, 47 AD3d 981, 982 [2008]). Based upon our review of the record, we conclude that neither standard has been met.

In challenging the jury's verdict, defendants argue that plaintiff's conduct in entering the switchgear cabinet on that second occasion—specifically without verifying that it was deenergized and/or wearing protective gear—constituted a superceding or intervening cause sufficient to break any causal connection between their alleged negligence and plaintiff's resulting injuries. We cannot agree. To be sure, as defendants observe, when plaintiff returned to the basement to identify and cut the C phase cable, the lights were on and the transformers were humming signaling that there was some sort of power source which had been activated in the interim. In this regard,

plaintiff candidly testified that he was aware that there was an alternate feed entering the building and realized, having read a warning sign on the inner grate door, that there was a possibility of "backfeed" in the system.[4] Plaintiff also had available to him certain safety gear, including a tic tracer, which would have alerted him to the energy lurking in the preferred switchgear, and protective clothing, neither of which he used prior to attempting to identify the C phase cable.

However, no one from either RPI or High Voltage advised plaintiff that the MRC had been reenergized via the alternate feed. Specifically, neither Mininberg, from whom plaintiff had previously sought reassurance regarding the electrical status of the switchgear, nor Hilt, who was instrumental in reenergizing the MRC, uttered a word to plaintiff on this subject. Further, in what can only be described as a complete lack of coordination and breakdown in communication on the part of defendants, Mininberg sent plaintiff and Neissel to the basement to perform the exact same task Surman simultaneously sent Hilt and Galbraith to execute, i.e., identifying and cutting the C phase cable in the junction box. Hilt and Galbraith arrived first, and Hilt used his key to unlock the outer door to the right cabinet.[5] Hilt testified that when plaintiff and his father arrived in the basement, plaintiff's father pulled on various cables in the junction box while plaintiff attempted to peer through the inner grate door to observe any movement in the switchgear. When this proved unsuccessful, both Hilt and Timothy Beasock, another electrician present at the time of plaintiff's accident, testified that plaintiff used a pair of channel locks to remove the bolts securing the inner grate door, opened the door and reached into the right cabinet. In an effort to get a better grip on the cables, plaintiff reached further into the cabinet and came into contact with the open blades of the switchgear, resulting in his being severely burned.

---

4. The potential for backfeed, which Mininberg testified is a misnomer, exists because the switchgears are tied together via a common bus bar; hence, if either switchgear is energized, there is energy in the common bus bar. Thus, if the alternate feed in the left cabinet is energized, the possibility exists that portions of the right cabinet remain energized.

5. It is undisputed that neither plaintiff nor his father possessed or had access to the key that unlocked the outer door to the switchgear. Accordingly, had Hilt not unlocked the door, plaintiff could not have entered the switchgear to any extent. Indeed, both plaintiff and his father testified that had they found the outer door to the switchgear locked, they would have realized that there had been a change in the status of the switchgear and would have consulted with Mininberg before proceeding. Specifically, plaintiff and his father unequivocally testified that they would never enter a locked switchgear, as a locked outer door was a clear indication of an electrical hazard.

While there was some dispute at trial as to whether plaintiff was given specific instructions as to how he should go about identifying the C phase cable and, further, whether it was even possible to do so without opening the inner grate door in the right cabinet, there is no dispute that Hilt, fully aware that the MRC had been reenergized via the alternate feed, stood by silently as plaintiff unbolted the inner grate door and reached into the switchgear. Despite the fact that Hilt plainly was aware that portions of the right cabinet could be energized—indeed, he and Galbraith paused before opening the inner grate door in order to retrieve a tic tracer to ascertain the status of the cabinet—he made no effort to warn plaintiff of the hazard contained therein.

Plaintiff's decision to enter the switchgear in order to identify the C phase cable may have been ill advised and/or careless, but this simply is not a case where "the plaintiff recognized the danger and chose to disregard it, thus rendering the plaintiff's conduct the sole proximate cause" of the injuries sustained (*Skibinski v Salvation Army*, 307 AD2d 427, 428 [2003]; *accord Nash v Fitzgerald*, 14 AD3d 850, 852 [2005]). Plaintiff repeatedly testified that the open outer door signaled to him that the switchgear was as he had left it, i.e., deenergized, and he fully expected that had the cabinet been reenergized, someone with knowledge of that event, i.e., Mininberg or Hilt, would have told him so (*see* n 5, *supra*). Moreover, despite the fact that plaintiff admittedly had worked on numerous switchgears in the past and was aware of the possibility of backfeed, the record reveals that each switchgear is different and, more to the point, that plaintiff did not fully appreciate how this particular switchgear, which Beasock agreed could be described as something of a "dinosaur," worked. Under such circumstances, plaintiff's conduct cannot be said to have been so extraordinary as to render his actions the sole proximate cause of the accident. We therefore conclude that the jury's verdict is neither legally insufficient nor against the weight of the evidence. To the contrary, given the totality of the evidence, the jury's apportionment of liability is supported by the record and will not be disturbed.

Turning to the issue of damages, despite High Voltage's protestations to the contrary, we have no quarrel with the reduced award of $51,000 for future medical expenses. While neither plaintiff's plastic surgeon nor his treating psychologist could precisely state how many additional surgeries or treatment sessions he would need, the sum awarded is not based solely upon speculation and does not exceed the amount supported by the evidence (*compare Petrilli v Federated Dept.*

*Stores, Inc.*, 40 AD3d 1339, 1344 [2007]). Accordingly, we discern no basis for disturbing this portion of the award.

We reach a similar conclusion regarding the $3 million awarded for future pain and suffering, reduced by 20% due to the jury's apportionment of fault to plaintiff. "An award for pain and suffering is inherently a subjective inquiry, not subject to precise quantification, and generally presents a question of fact for the jury" (*id.* at 1343 [citations omitted]). Plaintiff, who was 24 years old at the time of the accident, sustained third, fourth and fifth degree burns to portions of his arms, torso and right hand.[6] Although only approximately 7% of plaintiff's external skin was damaged, he sustained significant muscle loss, which cannot be regained. Similarly, plaintiff lacks normal strength, feeling and sensation in his arms due to the muscle and nerve damage and, because plaintiff has no oil or sweat glands in the areas where skin grafts were performed, the skin cracks, dries and is unable to regulate heat. Additionally, plaintiff's treating psychologist testified at length regarding the psychological symptoms suffered by him, including post-traumatic stress disorder, flashbacks, nightmares, social isolation and panic attacks. In light of such testimony, we cannot say that the jury's award in this regard "deviates materially from what would be reasonable compensation" (CPLR 5501 [c]).

Defendant's remaining contentions, including the claim that summary judgment should have been awarded to them and RPI's specific claim that it is entitled to contractual indemnification, have been examined and found to be lacking in merit.

Peters, J.P., Spain, Lahtinen and Malone Jr., JJ., concur. Ordered that the appeal from the order entered November 30, 2006 is dismissed. Ordered that the order entered July 20, 2007, the judgment and the amended judgment are affirmed, with costs.

---

**6.** Fourth degree burns extend down to the fatty tissue, while fifth degree burns extend to the bone.