Egan Jr., J.
Appeals (1) from a judgment of the Supreme Court (Crowell, J.), entered August 8, 2013 in Saratoga County, upon a verdict rendered in favor of plaintiffs, and (2) from an order of said court, entered September 20, 2013 in Saratoga County, which denied defendants’ motion to, among other things, set aside the verdict.
In April 2002, defendant Joseph J. Guido, the sole member of defendant Real Property Solutions, LLC (hereinafter RPS), purchased certain commercial property located on Radar Road in the Town of Stillwater, Saratoga County for $95,000. The property in question consisted of a parcel of land improved by nine single-family ranch-style homes. In conjunction therewith, Guido formed a trust to hold title to the property, and RPS was named as the trustee thereof. At the time of purchase, the property did not have a functioning waste disposal system, and defendants thereafter retained third-party defendant, Harold Berger, an engineer, to design a septic system for the property, which was installed at some point in 2003.
In September 2003, defendants were advised of outstanding *1007 code violations with respect to the property, which included the need for Berger to tender a letter “signing off’ on the installation of the 2003 septic system. Thereafter, in January 2004, the Environmental Protection Agency notified Guido that testing of the water supply at the property uncovered the possible presence of diesel fuel in samples acquired from four of the residences and, beginning in May 2004, defendants were informed by the Town of Stillwater and the Department of Environmental Conservation (hereinafter DEC) that partially treated sewage had been discovered on the property, requiring immediate remediation of the property’s septic system. In response, Guido entered into a consent order with DEC, paid a $1,000 fine and enlisted Berger to design a replacement septic system. The replacement system, which incorporated two 2,000-gallon septic tanks that were part of the original system installed in 2003, was operational as of December 31, 2004. In January 2005, Berger verified that the work was — with two noted exceptions — completed “in accordance with the approved plans,” but indicated that he was unable to issue his “final certification” until certain flow measurements could be performed — presumably in warmer weather. Berger testified that these post-winter testing and assessments were not completed, and there is no indication that a final certification was issued.
Thereafter, in or about June 2005, defendants listed the property for sale for $595,000. In conjunction therewith, defendants’ realtor prepared a property information sheet — to be given to prospective buyers — bearing the notation, “Septic system totally new — le[a]ch field totally replaced — new 5000 gallon holding tank,” as well as the general qualification that “all information [was] deemed reliable but not guaranteed.” Subsequently, in September 2005, plaintiffs and the trust established by Guido entered into a purchase and sale contract for the property. The contract, which reflected a purchase price of $545,000 and indicated that the buildings on the premises would be sold “as is,” also contained a waivable septic system contingency. Plaintiffs ultimately did not avail themselves of this contingency — a decision purportedly based, in part, upon plaintiffs’ belief that the property contained a new septic system. The contract also contained a mortgage contingency and, as a condition precedent to funding, plaintiffs’ bank required the completion of an environmental questionnaire. In completing that questionnaire, Guido, among other things, denied any knowledge of past environmental violations or problems with the property. While the contract was pending, Berger sent a letter to Guido raising various concerns regarding the septic system on the property, but Guido did not advise plaintiffs of these *1008 concerns. The closing occurred on November 23, 2005 and, within one month, the septic system failed, requiring plaintiffs to undertake substantial remediation efforts at their own expense. Ultimately, the lender foreclosed on the property and plaintiff Danny Revell declared bankruptcy.
Plaintiffs thereafter commenced this action against defendants for fraudulent misrepresentation. Following joinder of issue and defendants’ commencement of a third-party action against Berger, plaintiffs moved for partial summary judgment and defendants cross-moved for similar relief. Supreme Court (Ferradino, J.), among other things, granted plaintiffs motion for partial summary judgment on the issue of liability. Upon appeal, this Court reversed that portion of Supreme Court’s order (101 AD3d 1454 [2012]).[1] At the conclusion of the lengthy trial that followed, the jury returned a verdict in favor of plaintiffs and awarded damages in the amount of $353,800.46. Judgment in the amount of $598,821.38, including interest and costs, thereafter was entered. Supreme Court (Crowell, J.) denied defendants’ subsequent motion to set aside the verdict or, in the alternative, for a new trial, prompting these appeals.[2]
We affirm. Initially, we reject defendants’ assertion that Supreme Court’s various evidentiary rulings operated to deprive them of a fair trial. Without belaboring the point, suffice it to say that “the ‘scope and manner [of cross-examination] are [matters] left to the sound discretion of the trial court’ ” (Matter of Dustin JJ. [Clyde KK.], 114 AD3d 1050, 1052 [2014], lv denied 23 NY3d 901 [2014], quoting Salm v Moses, 13 NY3d 816, 817 [2009]; see Siemucha v Garrison, 111 AD3d 1398, 1399-1400 [2013]) and, absent an abuse of such discretion, the trial court’s determination in this regard is beyond this Court’s review (see Salm v Moses 13 NY3d at 817). Although defendants contend that Supreme Court improperly curtailed their questioning of Revell, the trial transcript reveals that defendants were able to conduct an effective — and extensive — cross-examination of him and, in so doing, challenge his credibility and advance their own defense (see Neissel v Rensselaer Polytechnic Inst., 54 AD3d 446, 449-450 [2008], lv denied 11 NY3d 716 [2009]).
Defendants next contend that Supreme Court erred in permitting Revell to testify as to a conversation he had with Berger, wherein Berger indicated that he had discussed the problems *1009 with the septic system with Guido. Although we agree that Berger’s statements in this regard did not qualify as party admissions and, hence, constituted inadmissible hearsay, other evidence in the record — including Guido’s own testimony— established his awareness of problems with the septic system. We therefore deem the admission of Berger’s statements to be harmless error (cf. Warner v Village of Chatham, 194 AD2d 980, 981-982 [1993]).
To the extent that defendants contend that Supreme Court improperly permitted testimony as to certain losses sustained by plaintiffs, the case law makes clear that where, as here, a cause of action for fraud has been asserted, “[t]he true measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the ‘out-of-pocket’ rule. . . . Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud” (Lama Holding Co. v Smith Barney, 88 NY2d 413, 421 [1996] [internal quotation marks and citations omitted]; see Route 217, LLC v Greer, 119 AD3d 1018, 1019-1020 [2014]; Howard S. v Lillian S., 62 AD3d 187, 193 [2009], affd 14 NY3d 431 [2010]).
Here, the record indeed reflects that both Revell and his accountant testified as to, among other things, the lost rents or lost profits incurred in connection with the property. The record also reveals, however, that the testimony regarding lost rents was stricken from the record, that the jury was specifically instructed to disregard the accountant’s testimony in this regard and that any mention of lost profits was removed from the verdict sheet. As a result, we are satisfied that Supreme Court’s remedial efforts and curative instructions “were sufficient to alleviate the prejudicial effect of the error” (Dennis v Capital Dist. Transp. Auth., 274 AD2d 802, 803 [2000]; see Valentine v Lopez, 283 AD2d 739, 742 [2001]).
Finally, we find no merit to defendants’ claim that Supreme Court failed to preside over the trial in a fair and impartial manner. Contrary to defendants’ selective reading of the trial transcript, the commentary and colloquies “cited by [defendants] when viewed in their proper context reveal nothing more than an evenhanded attempt towards focusing the proceedings on the relevant issues and clarifying facts material to the case in order to expedite the trial” (Heilbrunn v Town of Woodstock, 50 AD3d 1377, 1380 [2008] [internal quotation marks and citation omitted]). Defendants’ remaining evidentiary challenges, to *1010 the extent not specifically addressed, have been examined and found to be lacking in merit.
Turning to defendants’ challenge to the verdict itself, a verdict may be set aside as unsupported by legally sufficient evidence “if ‘there is simply no valid line of reasoning and permissible inferences which could possibly lead rational [persons] to the conclusion reached by the jury on the basis of the evidence presented at trial’ ” (O’Connor v Sleasman, 37 AD3d 954, 956 [2007], lv denied 9 NY3d 806 [2007], quoting Cohen v Hallmark Cards, 45 NY2d 493, 499 [1978]). Further; a verdict may be set aside as against the weight of the evidence where the court determines that “ ‘the evidence so preponderate [d] in favor of the [moving party] that [the verdict] could not have been reached on any fair interpretation of the evidence’ ” (Lolik v Big v Supermarkets, 86 NY2d 744, 746 [1995], quoting Moffatt v Moffatt, 86 AD2d 864, 864 [1982], affd 62 NY2d 875 [1984]; see Bouchard v Champlain Enters., Inc., 53 AD3d 933, 935 [2008]). Applying these standards to the record before us, we find that the jury’s verdict is supported by legally sufficient evidence and, further, is in accord with the weight of the evidence.
To prevail upon their cause of action for fraud, plaintiffs were required to establish that defendants, with the intent to deceive, misrepresented or omitted a material fact that they knew to be false and that plaintiffs, in turn, justifiably relied upon such misrepresentation or omission, thereby incurring damages (see Route 217, LLC v Greer, 119 AD3d at 1019; McColgan v Brewer, 112 AD3d 1191, 1193 [2013], lv denied 24 NY3d 911 [2014]). As to the misrepresentation element, plaintiffs point to the statement made on the property information sheet (“Septic system totally new — le[a]ch field totally replaced — new 5000 gallon holding tank”), as well as Guido’s responses to certain of the inquiries contained on the environmental questionnaire. In this regard, the record reflects that the septic system installed in 2004 was not “totally new,” as it retained the original pump house structure and, more to the point, utilized the holding tanks that originally were part of the system installed in 2003. Additionally, there is no question that the system did not contain a single 5,000-gallon holding tank but, rather, two 2,000-gallon holding tanks. There also is no question that Guido provided false answers to various inquiries posed on the environmental questionnaire. For example, Guido disavowed any knowledge of “governmental notification relating to past or recurrent violations of environmental laws with respect to the property or any facility located on the property” (question No. 14) — despite having been advised by the Town of Stillwater and DEC that *1011 partially treated sewage was discovered on the property in 2004 and having paid a fine in connection therewith. Similarly, Guido denied having “been informed of the past or current existence of hazardous substances or petroleum products or environmental violations with respect to the property” (question No. 15)— even though the Environmental Protection Agency alerted him to the possible presence of diesel fuel in the water supply at the property in January 2004. To the extent that Guido offered various explanations for his conduct and asserted that such representations were not in fact misrepresentations, this presented factual and credibility issues for the jury to resolve.
As to the intent element, “[bjecause direct proof of actual intent is rare” (Matter of Bernasconi v Aeon, LLC, 105 AD3d 1167, 1167 [2013]), intent may be inferred from the surrounding circumstances — including whether the subject statements were recklessly made (see generally Matter of Josifidis v Daines, 89 AD3d 1257, 1258 [2011], lv denied 19 NY3d 801 [2012]; Pidwell v Duvall, 28 AD3d 829, 831-832 [2006]). Guido, who had been “involved in the purchase or sale of hundreds of properties,” admittedly “breezed through” the environmental questionnaire — despite knowing that such document “went with the sale of the property.” Given the arguably cavalier manner in which Guido completed the environmental questionnaire, as well as his extensive knowledge regarding the documented problems with the original septic system and Berger’s lingering concerns regarding the replacement system, the jury could properly find that Guido made the cited misrepresentations with the intent to deceive plaintiffs.
With respect to the issue of justifiable reliance, Revell testified that he conducted a visual inspection of the property prior to making an offer and did not observe any conditions indicative of a problem with the septic system. Additionally, an engineer appearing on behalf of plaintiffs testified that, if a septic system was represented to be “totally new” and a visual inspection of the property did not reveal any “red flags,” i.e., boggy areas, odors or liquids bubbling up to the surface, one “would assume that the system was working properly” and only “a general walk-around and . . . above-grade” inspection would be required. Such testimony, in our view, would permit the jury to find that plaintiffs’ reliance upon the representation contained in the property information sheet was reasonable.
To the extent that defendants contend that plaintiffs cannot rely upon the representations contained in the environmental questionnaire because such representations were made only to plaintiffs’ bank, we do not agree. In this regard, there is no *1012 question that the purchase and sale contract for the property contained a mortgage contingency, that financing for the sale was “conditioned on the [blank’s satisfactory review of environmental information,” that Guido completed the questionnaire knowing — in general terms — “that [it] went with the sale of the property” and that such questionnaire plainly identified plaintiffs as the purchasers of the property. Under these circumstances, plaintiffs could properly rely upon the post-contract representations made to the bank in the context of the questionnaire (see Caramante v Barton, 114 AD2d 680, 681-682 [1985]). Simply put, Guido “spoke false and deceitful words to . . . plaintiffs through the [bank] just as effectually as if they had met face to face” (Tindle v Birkett, 171 NY 520, 524 [1902]). As we are otherwise satisfied that plaintiffs met their burden of proof as to damages (see infra), we find that the jury’s verdict is supported by legally sufficient evidence and is in accord with the weight of the evidence.
The remaining arguments raised by defendants do not warrant extended discussion. Although defendants fault Supreme Court for failing to distinguish between the “totally new” and “environmental questionnaire” misrepresentations on the jury verdict sheet, the fact remains that plaintiffs alleged only one cause of action for fraud. Under these circumstances, we do not find the verdict sheet to be defective (compare Harvey v Suds N’ Fluff Laundromat, 194 AD2d 644, 645 [1993]; Zalduondo v City of New York, 141 AD2d 816, 817-818 [1988]).
Nor are we persuaded that plaintiffs failed to tender sufficient admissible proof to substantiate the damages awarded by the jury. During the trial, the parties stipulated to the admission into evidence of exhibit No. 29 — a binder containing, among other things, an abundance of receipts, invoices, billing statements and canceled checks detailing plaintiffs’ expenditures related to the subject property — and plaintiffs’ forensic accountant, in turn, utilized such documents to arrive at a damages figure. Although defendants indeed objected to any documentation and/or testimony pertaining to lost profits or lost rents— items that ultimately were not considered by the jury (see supra) — the record makes clear that defendants were not challenging the substance of the documentation supplied by plaintiffs to substantiate the balance of their damages claim. Notably, with regard to exhibit No. 29, counsel for defendants stated, “[W]e’ve agreed to the stipulation . . . and the numbers in the exhibit[ ] strictly to expedite matters. . . . We don’t want to go through a line by line on those to break out what would or would not be a proper item of damage. We’d be here for the rest *1013 of our lives.” In any event, based upon our review of the subject exhibit and the forensic accountant’s testimony, we are satisfied that plaintiffs tendered sufficient admissible proof to sustain the damages awarded by the jury.
We do, however, find merit to defendants’ claim that the interest awarded on the underlying award of damages was improperly calculated. Pursuant to CPLR 5001 (b), “[i]nterest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon such damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.” It is the jury’s responsibility to specify the date from which interest is to be computed, but “[i]f [the] jury is discharged without specifying the date, the court upon motion shall fix the date” — unless such date “is certain and not in dispute,” in which case the clerk of the court may fix the date upon affidavit (CPLR 5001 [c]).
Here, plaintiffs submitted a proposed judgment to the Saratoga County Clerk requesting that interest be computed from the date of the closing — November 23, 2005. Defendants opposed this relief, contending that the relevant date from which interest should be computed was in dispute, and expressly requested that plaintiffs be directed “to proceed in accordance with CPLR . . . 5001 (c) by motion and to refer this matter to the [c]ourt to set a date for [a] hearing to fix the proper dates and amounts.” Notwithstanding this request, the Saratoga County Clerk entered judgment shortly thereafter — with interest computed from November 23, 2005. As the relevant dates indeed are in dispute, we must vacate the award of interest and remit this matter to Supreme Court for a hearing as to the proper date(s) upon which such interest should be computed. Defendants’ remaining contentions, including their assertion that Supreme Court erred in denying their motion to set aside the verdict, have been examined and found to be lacking in merit.
Lahtinen, J.P, McCarthy, Rose and Clark, JJ., concur.
Ordered that the judgment is modified, on the law, without costs, by reversing so much thereof as awarded interest in the amount of $243,395.68; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court’s decision; and, as so modified, affirmed. Ordered that the order is affirmed, without costs.

. In the interim, Supreme Court bifurcated the third-party action from the main action, directing that the third-party action be tried following completion of the tried in the main action.

. Defendants’ subsequent motion for a stay pending appeal was denied.