# State of New York
## Supreme Court, Appellate Division
### Third Judicial Department

Decided and Entered:  October 29, 2015          515406
                                                518498
_____

SCIENCE APPLICATIONS
    INTERNATIONAL CORPORATION,
                      Respondent-
                      Appellant,

        v

ENVIRONMENTAL RISK SOLUTIONS,
    LLC, et al.,
                      Defendants,
        and

1694 NIAGARA FALLS BLVD
    TONAWANDA, LLC, et al.,
                      Appellants-
                      Respondents.

(Action No. 1.)
_____          MEMORANDUM  AND  ORDER

BLOUNT ENERGY, INC., et al.,
                      Appellants-
                      Respondents,

        v

ENVIRONMENTAL RISK SOLUTIONS,
    LLC, et al.,
                      Defendants,
        and

SCIENCE APPLICATIONS
    INTERNATIONAL CORPORATION,
                      Respondent-
                      Appellant.

(Action No. 2.)
_____


Calendar Date:  September 17, 2105

Before:  Peters, P.J., McCarthy, Garry and Rose, JJ.

_____


        Harriton & Furrer, LLP, Armonk (Urs Broderick Furrer of
counsel), for appellants-respondents.

        Tabner, Ryan & Keniry, LLP, Albany (Thomas R. Fallati of
counsel), for respondent-appellant.

_____


Rose, J.

        Cross appeals (1) from an order of the Supreme Court
(Teresi, J.), entered October 5, 2012 in Albany County, which, in
action No. 1, among other things, denied plaintiff's cross motion
seeking to amend its pleading to add certain affirmative
defenses, (2) from an order of said court, entered October 15,
2012 in Albany County, which, in action No. 1, denied certain
defendants' motion to reargue, (3) from an order of said court
(McDonough, J.), entered January 24, 2014 in Albany County, upon
a decision of the court in favor of Science Applications
International Corporation, and (4) upon the judgment entered
thereon.

        ExxonMobil Corporation sold and/or assigned lease rights to
47 gas station sites in upstate New York to various entities
affiliated with Lehigh Gas Corporation (hereinafter collectively
referred to as Lehigh).  Both ExxonMobil and Lehigh were aware
that the sites were affected by varying degrees of petroleum
contamination, and the purchase and sale agreements required
Lehigh to assume, in perpetuity, all liability resulting from any
such contamination.  They also executed three Remediation Escrow
Agreements whereby ExxonMobil agreed to, among other things,
establish and fund escrow accounts for the purpose of covering
the estimated costs for Lehigh to achieve regulatory closure of
the spill numbers established by the Department of Environmental

Conservation (hereinafter DEC) for each of the 47 sites.

Thereafter, Lehigh hired defendant Environmental Risk Solutions, LLC (hereinafter ERS) as its environmental remediation contractor. ERS, in turn, retained Science Applications International Corporation (hereinafter SAIC), with whom it had a preexisting Professional Services Master Agreement (hereinafter PSMA), as its subcontractor to perform the actual onsite remediation work. To that end, ERS and SAIC entered into three separate subcontracts designated as Project Specific Scopes of Work (hereinafter PSSW) that were, as relevant here, identical in language. The PSSWs required SAIC to perform remediation at each site for a fixed price, regardless of the actual site-specific cleanup costs incurred in achieving the appropriate remediation standard, with the fixed price for each site to be paid from the escrowed funds.

After SAIC obtained closure of DEC spill numbers at 18 of the 47 sites, ERS – at Lehigh's request – notified SAIC that it was being "terminated for convenience" pursuant to section 14.2 of the PSMA. SAIC then wound down its operations and submitted final invoices to ERS for payment. When no further payments were forthcoming, SAIC filed notices of mechanic's liens on seven of the sites based upon remediation work that it had allegedly performed and for which it was not fully compensated. Thereafter, SAIC commenced action No. 1 alleging, among other things, breach of contract against ERS and seeking the foreclosure of the mechanic's liens against Lehigh. Lehigh responded with action No. 2, which alleged, among other things, breach of contract against ERS and SAIC. Action Nos. 1 and 2 were joined and, following discovery and extended motion practice, Supreme Court (Teresi, J.), issued an order entered October 5, 2012, which, among other things, denied SAIC's request to amend its pleadings. SAIC and Lehigh cross-appeal from this order.[1]

---

[1]    These cross appeals must be dismissed, inasmuch as SAIC concedes in its brief that its cross appeal is moot, and Lehigh has effectively abandoned its cross appeal by failing to raise in

On the eve of trial, Lehigh settled all of its outstanding claims against ERS.  SAIC then agreed to sever all of its claims and cross claims against ERS, thereby removing ERS as a party to these actions.  Following a five-week nonjury trial, Supreme Court (McDonough, J.) issued a decision and order entered January 24, 2014 that, among other things, permitted foreclosure of six of SAIC's mechanic's liens and dismissed Lehigh's counterclaims in action No. 1.  As for action No. 2, Supreme Court determined that Lehigh had failed to prove its causes of action for breach of contract and fraud, denied its remaining claims and dismissed SAIC's counterclaims.  Supreme Court also denied each party's request for counsel fees.  The court then entered judgment in accord with its order, and SAIC and Lehigh now cross-appeal from both the order and the judgment.

Upon our review of a nonjury trial, we will independently review the record and grant any judgment that we find to be warranted (see Mazza v Fleet Bank, 16 AD3d 761, 762 [2005]; Amodeo v Town of Marlborough, 307 AD2d 507, 508 [2003]).  While our overall review of Supreme Court's order and judgment is rooted in New York law, we will accept the parties' agreement that Lehigh's claim in action No. 2 — that SAIC breached the PSSWs by failing to fully perform its remediation obligations — is governed by Pennsylvania law.  Under Pennsylvania law, "[t]he necessary material facts that must be alleged for such an action are simple: there was a contract, the defendant breached it, and plaintiffs suffered damages from the breach" (McShea v City of Philadelphia, 606 Pa 88, 97, 995 A2d 334, 340 [2010]; see Stein v Magarity, 102 A3d 1010, 1013-1014 [PA Super 2014]).  Here, neither Lehigh nor SAIC questions the validity of the PSSWs.

---

its brief any argument regarding this order's propriety (see Mayr v Alvarez, 130 AD3d 1199, 1200 n 1 [2015]; Miller v Genoa AG Ctr., Inc., 124 AD3d 1113, 1114 n [2015]).  To the extent that Lehigh also appeals from the court's October 15, 2012 order denying its subsequent motion to reargue, no appeal lies therefrom (see Schillaci v Sarris, 122 AD3d 1085, 1087 [2014]; Matter of Yager v Massena Cent. Sch. Dist., 119 AD3d 1066, 1068-1069 [2014]).

Rather, the central issue in this dispute is one of contract interpretation, as the parties present starkly contrasting views of how the PSSWs define the scope of SAIC's remediation obligations.

When a court must resolve questions of contract interpretation, "[t]he fundamental rule . . . is to ascertain and give effect to the intent of the contracting parties" (Murphy v Duquense Univ. of The Holy Ghost, 565 Pa 571, 590-591, 777 A2d 418, 429 [2001]; see Robert F. Felte, Inc. v White, 451 Pa 137, 143, 302 A2d 347, 351 [1973]). If the terms of the contract are unambiguous, "the intent of the parties is to be ascertained from the document itself" (Insurance Adjustment Bureau, Inc. v Allstate Ins. Co., 588 Pa 470, 481, 905 A2d 462, 468 [2006]; see Lesko v Frankford Hospital-Bucks County, 609 Pa 115, 123, 15 A3d 337, 342 [2011]). However, when a contract is "reasonably susceptible of different constructions and capable of being understood in more than one sense" (Trizechahn Gateway LLC v Titus, 601 Pa 637, 653, 976 A2d 474, 483 [2009] [internal quotation marks and citation omitted]; accord Ferrer v Trustees of Univ. of Pa., 573 Pa 310, 339, 825 A2d 591, 608 [2002]), "parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances" (Insurance Adjustment Bureau, Inc. v Allstate Ins. Co., 588 Pa at 481).

Here, we agree with Supreme Court that most of the disputed terms regarding SAIC's remediation obligations under the PSSWs are "a compromised hodgepodge of conflicting proposals" susceptible to several reasonable interpretations. As an example, Lehigh's argument that section 5 (a) (1) of the PSSWs unambiguously required SAIC to, among other things, meet a stringent, contractually defined "Cleanup Standard" is belied by section 5 (a) (3) of the PSSWs, which — also unambiguously — permits SAIC to remediate the sites by, among other things, achieving regulatory closure of the spill numbers from DEC, as indicated by receipt of "no further action" (hereinafter NFA) letters from DEC.

As an additional example, SAIC argues that Lehigh's consent to seek spill number closures pursuant to section 5 (a) (3) of the PSSWs could be obtained passively via the review and comment procedure set forth in section 5 (p) of the PSSWs. Nowhere in the PSSWs, however, does it indicate that SAIC could rely on this subsection to obtain Lehigh's consent — passively or otherwise — to proceed with regulatory closure pursuant to section 5 (a) (3). Likewise, the PSSWs fail to provide any alternative mechanism or procedure for Lehigh to review and comment on SAIC's submissions to DEC. This failure on the part of Lehigh and SAIC to articulate an adequately defined procedure for how SAIC was to obtain Lehigh's consent to proceed with an alternate cleanup standard left the ultimate formation of such a procedure susceptible to the varied and subjective constructions of the parties, thus creating additional ambiguity.

Further ambiguity arose with regard to section 5 (g) of the PSSWs, an inherently contradictory provision governing when SAIC's remediation work at a given site could be considered complete. In its first clause, section 5 (g) references SAIC's obligations pursuant to section 5 (a) (1) of the PSSWs, stating that "SAIC's remediation and monitoring obligations under this [PSSW] shall cease upon attainment of the Cleanup Standard <u>and</u> receipt of [NFA] Status from DEC for each [s]ite as defined in [section 5 (a)]" (emphasis added). However, the very next clause contradicts the prior one, stating that, "[u]pon receipt of [NFA] Status confirmation from DEC, SAIC's remediation and monitoring obligations shall cease, except for re-openers to the extent found to be due to SAIC's negligence[.]" In light of these ambiguities, we find that Supreme Court appropriately considered parol evidence to determine both the intent of the parties and whether SAIC breached the PSSWs (see <u>Insurance Adjustment Bureau, Inc. v Allstate Ins. Co.</u>, 588 Pa at 481; <u>Murphy v Duquense Univ. of The Holy Ghost</u>, 565 Pa at 591).

Generally speaking, under Pennsylvania law, when considering parol evidence to resolve contractual ambiguities, the course of performance between the contracting parties is "perhaps the strongest indication of what the writing means" (<u>Atlantic Richfield Co. v Razumic</u>, 480 Pa 366, 376, 390 A2d 736,

741 [1978]; accord Matt Lamb & Sons, Inc. v Christian Schmidt
Brewing Co., 336 Pa Super 341, 351, 485 A2d 836, 841 [1984]).
Indeed, "[w]herever reasonable, the manifestations of intention
of the parties to a promise or agreement are interpreted as
consistent with each other and with any relevant course of
performance" (Sunbeam Corp. v Liberty Mut. Ins. Co., 566 Pa 494,
501, 781 A2d 1189, 1193 [2001] [internal quotation marks and
citation omitted]; accord Solomon v U.S. Healthcare Systems of
Pa., Inc., 797 A2d 346, 350 [PA Super 2002], lv denied 570 Pa 688
[2002]).

    Here, SAIC concedes that, during the performance of its
remediation obligations, it never met the more stringent cleanup
standards required by section 5 (a) (1) of the PSSWs.
Nonetheless, SAIC maintains that it fully complied with its
remedial obligations by obtaining Lehigh's passive consent to
utilize the alternative cleanup standards required to obtain
spill number closures in accordance with section 5 (a) (3) of the
PSSWs.  We agree.  The evidence reveals that, prior to requesting
closure of an open spill number from DEC, it was SAIC's regular
practice to post relevant documentation, including, among other
things, remedial action plans,[2] to a File Transfer Protocol
(hereinafter FTP) site to allow for review and comment by ERS and
Lehigh pursuant to the terms of section 5 (p) of the PSSWs.  Each
time it posted such information to the FTP site, if SAIC did not
receive any objections within the 10-day review period provided
by section 5 (p), SAIC assumed — as section 5 (p) entitled it to
do — that ERS and Lehigh had approved its proposed submissions
and, by extension, consented to its remedial action plan as
required by section 5 (a) (3).  This, in turn, prompted SAIC to
contact DEC and seek closure of the spill number pursuant to
DEC's Spill Guidance Manual.

    Between late 2006, when remediation work began, and late

_____

    [2]  Remedial action plans provided detailed designs of the
intended cleanup strategy for a given site and, as such, were an
instrumental component of each application to DEC seeking spill
number closure.

2008, SAIC relied solely upon the above-described procedure to seek and obtain consent from Lehigh to pursue spill number closures according to its remedial action plans.  These extensive, highly detailed plans were proposals to utilize the cleanup standards authorized by section 5 (a) (3) of the PSSWs, and should have been considered as such by Lehigh, a sophisticated party undoubtedly familiar with the subject matter. At no point during this two-year period did ERS or Lehigh ever object to the remedial action plans or other documentation that SAIC posted on the FTP site, and there is no evidence tending to show that Lehigh was unable to do so.  In our view, given that SAIC obtained spill number closure in accordance with the Spill Guidance Manual at 18 sites, and inasmuch as the parties' course of performance leading up to the closures is consistent with SAIC's interpretation of subsections (a) (3) and (p) of section 5, we find that the parties intended to permit SAIC to obtain Lehigh's passive consent to seek spill number closure pursuant to section 5 (a) (3), and that Lehigh manifested its consent by not objecting to SAIC's remedial action plans, or any other relevant documentation, within the section 5 (p) review period (see Sunbeam Corp. v Liberty Mut. Ins. Co., 566 Pa at 501; Solomon v U.S. Healthcare Systems of Pa., Inc., 797 A2d at 350).

        We likewise reject Lehigh's contention that the PSSWs required DEC to make express findings of infeasibility in order for SAIC to utilize section 5 (a) (3) of the PSSWs, as the claim is contradicted by the plain language of that subsection.  Lehigh also claims that SAIC should not have attempted to obtain its consent through the PSSWs and, instead, should have sought it in accordance with the PSMA.  Lehigh, however, was neither a party nor a third-party beneficiary to the PSMA and, thus, Lehigh cannot argue that the consent procedures between it and SAIC are governed by anything other than the PSSWs, to which Lehigh was expressly made a third-party beneficiary.

        The parties' course of performance between late 2008 and mid 2009 leads us to the further conclusion that, despite the conflicting language in section 5 (g) of the PSSWs, the parties intended to relieve SAIC of any further remediation obligations at a given site upon achieving NFA status, regardless of whether

the more stringent cleanup standard set forth in section 5 (a) (1) of the PSSWs had been met. Despite Lehigh's desire, after two years of acquiescence, to alter the consent procedure for future spill number requests, and despite the fact that residual petroleum contamination might remain at the 18 sites at which SAIC had already attained NFA status, Lehigh failed to charge SAIC with any breach of contract and did not specifically reserve any rights with respect thereto. Nor did Lehigh mandate that SAIC return to any of those sites to perform additional remediation in order to satisfy the more stringent standards set forth in section 5 (a) (1). Instead, Lehigh agreed to move forward with remediation at the remaining 29 sites and approved payment of approximately $800,000 in SAIC invoices that were then in arrears. Accordingly, we concur with Supreme Court's determination to dismiss Lehigh's breach of contract claim in action No. 2, inasmuch as the parol evidence makes clear that SAIC performed its remedial obligations in accordance with the PSSWs.

We likewise concur that, in action No. 2, Supreme Court appropriately dismissed Lehigh's fraud cause of action. In order to prevail upon its cause of action for fraud, Lehigh was required to establish that SAIC, "with the intent to deceive, misrepresented or omitted a material fact that [it] knew to be false and [Lehigh], in turn, justifiably relied upon such misrepresentation or omission, thereby incurring damages" (Revell v Guido, 124 AD3d 1006, 1010 [2015]; see Mandarin Trading Ltd. v Wildenstein, 16 NY3d 173, 178 [2011]; McColgan v Brewer, 112 AD3d 1191, 1193 [2013], lv denied 24 NY3d 911 [2014]). Here, Lehigh offered no evidence indicating that SAIC had any intention to not perform its contractual obligations pursuant to the PSSWs. We agree with Supreme Court's view that certain email messages between SAIC's managers could be characterized — at worst — as flippant, but they did not support a fraud cause of action. Nor could Lehigh have justifiably relied on any misrepresentations purportedly set forth by SAIC, as Lehigh had a full and fair opportunity to review and comment on SAIC's remedial action plans as well as the reprogramming of certain site-specific funds from one task to another pursuant to the procedure set forth in section 5 (p) of the PSSWs. To the extent that Lehigh avers that

SAIC misrepresented the degree of the contamination at various gas station sites, Supreme Court appropriately determined that its claims are premised on its dissatisfaction with SAIC's performance of its contractual obligations and duplicative of its breach of contract cause of action (see New York Univ. v Continental Ins. Co., 87 NY2d 308, 318-320 [1995]; Carpenter v Plattsburgh Wholesale Homes, Inc., 83 AD3d 1175, 1176 [2011]; see also Demetre v HMS Holdings Corp., 127 AD3d 493, 494 [2015]).

Next, we address a number of the arguments raised by the parties with regard to Supreme Court's award of damages. First, Lehigh argues that Supreme Court erred by granting SAIC's requests in action No. 1 to foreclose on six of SAIC's mechanic's liens. We disagree. To the extent that Lehigh argues, for the first time on appeal, that SAIC had no right to file the liens because the PSMA was not a "construction contract" and, thus, SAIC was not a "contractor" or "subcontractor" under General Business Law § 756, the argument is unpreserved for our review (see Anthony DeMarco & Sons Nursery, LLC v Maxim Constr. Serv. Corp., 130 AD3d 1409, 1411 [2015]). In any event, it is patently without merit, as the aforementioned definitions are particular to the General Business Law and are contradicted by separate definitions of the same terms in the Lien Law, which clearly allow SAIC to maintain the liens (see Lien Law § 2 [9], [10]).

Nor did Lehigh sufficiently prove that SAIC failed to perform the work for which it filed the subject liens or that it willfully exaggerated the amount of its lien claims. For the liens upon which it was allowed to foreclose, SAIC established the basis of each lien and the underlying unpaid work alleged to have been performed through the introduction of itemized statements of the lien claims, which were provided to Lehigh upon its demand (see Lien Law § 38; Associated Bldg. Servs., Inc. v Pentecostal Faith Church, 112 AD3d 1130, 1131-1132 [2013]). Lehigh's largely conclusory and unsupported allegations to the contrary are, in any event, refuted by extensive course of performance evidence indicating that Lehigh was fully aware of SAIC's invoicing practices and had consented to them for years, both through section 5 (p) of the PSSWs and by actually paying SAIC's invoices (compare Creech v Rufa, 101 AD3d 1224, 1225-1226

[2012]; <u>Tri-North Bldrs. v Di Donna</u>, 217 AD2d 886, 887 [1995]).
Furthermore, we find no credible evidence in the record tending
to indicate that SAIC willfully exaggerated the amounts of its
lien claims (see Lien Law §§ 39, 39-a; <u>Saratoga Assoc. Landscape
Architects, Architects, Engrs. & Planners, P.C. v Lauter Dev.
Group</u>, 77 AD3d 1219, 1223 [2010]; <u>Pyramid Champlain Co. v
Brosseau & Co.</u>, 267 AD2d 539, 542-543 [1999], <u>lv denied</u> 94 NY2d
760 [2000]).

     Finally, both Lehigh and SAIC argue that, pursuant to
section 20.8 of the PSMA, they are entitled to recover costs and
counsel fees from the other party.  However, inasmuch as Lehigh
is not a party to the PSMA, the only way that either Lehigh or
SAIC would be entitled to enforce this provision against the
other party is if Lehigh can be considered a third-party
beneficiary to the PSMA (see <u>Scarpitti v Weborg</u>, 530 Pa 366, 372-
373, 609 A2d 147, 150 [1992]).  Here, ERS and SAIC unambiguously
limited Lehigh's third-party beneficiary rights to the provisions
of the PSSWs only.  Thus, we find that neither SAIC nor Lehigh
has the right to enforce any provision of the PSMA against the
other, including section 20.8, which is the only provision in any
of the contracts relevant to this appeal that allows for the
recovery of costs and counsel fees (cf. <u>Ribarchak v Municipal
Auth. of City of Monongahela</u>, 44 A3d 706, 709-710 [Pa Cmwlth
2012], <u>lv denied</u> 618 Pa 692 [2012]; <u>Victoria Gardens Condominium
Assn. v Kennett Twp. of Chester County</u>, 23 A3d 1098, 1104-1106
[Pa Cmwlth 2011], <u>lv denied</u> 611 Pa 644 [2011]).

     To the extent that Lehigh's remaining arguments have not
been rendered academic by our decision, they have been considered
and found to be without merit.  We have also considered SAIC's
arguments regarding its purported entitlement to additional
damages beyond what was awarded by Supreme Court's judgment, and
find that SAIC has failed to make a sufficient showing as to any
of those claims.

     Peters, P.J., McCarthy and Garry, JJ., concur.

ORDERED that the appeals from the orders entered October 5, 2012 and October 15, 2012 are dismissed, without costs.

ORDERED that order entered January 24, 2014 and the judgment are affirmed, without costs.

ENTER:

Robert D. Mayberger
Clerk of the Court